PEARL LEAVELL, Plaintiff, v. WILLIAM H.
LEAVELL et ux., Defendants.

**Kansas City Court of Appeals, January 14, 1907.**

1. **HUSBAND AND WIFE: Alienation of Affections: Malice: Common Design.** In an action against both parents for alienating a husband's affections the plaintiff must show that the acts complained of were wrongful and intentionally done with common design for that purpose.

2. ———: ———: **Parent and Child: Malice: Action.** Malice must be shown. It need not consist in open and affirmative declarations, but may be made out by conduct and acts, and it is necessary to consider the circumstances, situation and relationship which exist between the parties; and in an action against his father and mother for alienating the husband's affections, the wife should positively show the *quo animo* of the act complained of, and the legal presumption is that the parent acted for the best interest of the child. The parent may act for the interest of the child in good faith and not be liable for the evil results; but where he is guilty of maliciously separating his married child he renders himself liable in damages.

3. ———: ———: ———: **Evidence.** The evidence relating to the conduct of a father and mother in alienating the affections of their son from his wife, is reviewed and held insufficient to sustain the action.

Appeal from Cass Circuit Court.—*Hon. Nick M. Bradley,* Judge.

REVERSED.

*Allen Glenn, Barnett Burney* and *A. A. Whitsitt* for appellants.

(1) There is no evidence to show any common design, or concert of action or understanding between defendants, the purpose of which was to separate plaintiff and her husband. This was necessary to sustain her

action. Hunt v. Simmonds, 19 Mo. 590; Alexander v. Refle, 9 Mo. App. 143; Bowman v. Lickey, 86 Mo. App. 47. (2) The evidence fails to show any pre-arranged or agreed course of conduct or action on part of defendants; the acts of one were not based on or connected with the acts of the other, but were distinct and separate. Defendants had the right to advise their child in good faith, and as parents, their motives are presumed to be in good faith, bad faith should not be presumed, good faith is inconsistent with conspiracy. Tucker v. Tucker, 32 L. R. A. 624, and notes; Gornard v. Gornard, 40 L. R. A. 550; Modisett v. McPike, 74 Mo. 647; Strode v. Abbott, 102 Mo. App. 169. (3) The burden of proof is on plaintiff to show, by a preponderance of the evidence that the defendants co-operated together, and acted in concert, and that such acts and conduct were the cause of the separation of the plaintiff and her husband, and that defendants acted in bad faith and their conduct and actions were the deliberate, willful and wanton purpose separating plaintiff and her husband. Nichols v. Nichols, 147 Mo. 387; Modisett v. McPike, 74 Mo. 647; Strode v. Abbott, 102 Mo. App. 169. (4) The evidence in this case is insufficient to support the verdict. The evidence must be of such a character as to remove the question from mere conjecture. Stokes v. Burns, 132 Mo. 214; Binger v. Railroad, 52 Mo. App. 119; Peck v. Railroad, 31 Mo. App. 123; Gerrans v. Mfg. Co., 51 Mo. App. 615; Leonard v. Railroad, 68 Mo. App. 48. Appellate courts will draw with a firm hand the line between tangible evidence and reasonable and legitimate deductions on the one hand, and mere conjecture or speculation on the other. Glick v. Railroad, 57 Mo. App. 97.

*J. S. Brierly, A. A. Howell* and *T. N. Haynes* for respondent.

(1) The instructions given on behalf of plaintiff conform to the requirements of this court in its former

opinion, and they have also been approved in the following cases: Love v. Love, 98 Mo. App. 562; Nichols v. Nichols, 147 Mo. 387; Yowell v. Vaughn, 85 Mo. App. 206; Modisett v. McPike, 74 Mo. 636. (2) The evidence abundantly shows that defendants co-operated together for the purpose of causing the separation, and that they accomplished that purpose; the jury were instructed on that theory at the instance of both parties, and found for plaintiff. Nichols v. Nichols, 147 Mo. 387; Love v. Love, 98 Mo. App. 562. (3) Plaintiff claims that by reason of their co-operation in causing the separation, defendants are jointly liable, and tried the case on that theory as shown by plaintiff's instruction, and defendants by their instructions submitted the case on the same theory, and are estopped from now claiming any different theory. Womach v. St. Joseph, 168 Mo. 236; Mitchell v. Railroad, 97 Mo. App. 411; Merton v. Case Co., 99 Mo. App. 630; Johnson v. Hutchinson, 81 Mo. App. 299; Horgan v. Brady, 155 Mo. 659. (4) Courts will not disturb the verdict of a jury when there is any evidence to support it. Oglebay v. Corby, 96 Mo. 285; Coats v. Lynch, 152 Mo. 161; Brod v. Transit Co., 115 Mo. App. 202; Drake v. Kansas City, 190 Mo. 390; State v. Smith, 190 Mo. 706.

ELLISON, J.—Defendants are husband and wife and this action was instituted to recover damages from them, for alienating the affections of plaintiff's husband who was the son of the defendants and who is known in this record as Garfield, his Christian name. There was a judgment in the trial court for the plaintiff.

The case is before us the second time. It is reported in 114 Mo. App. 24. By reference thereto, it will be found that plaintiff, a young woman nineteen years of age, and a son of defendants, twenty-two years of age, were married and came immediately to live with defendants who were elderly people living on a farm, plaintiff

being pregnant, as the result of illicit intercourse between her and Garfield. The petition charged that defendants "wrongfully, wickedly, wantonly and maliciously acted, conspired and co-operated together, with the wrongful, wicked, wanton and malicious intent to cause and induce" plaintiff's husband to abandon her. And that in pursuance of said intent, they did "wrongfully, wickedly, wantonly and maliciously entice, persuade, influence and induce plaintiff's husband to leave and abandon her." That since causing her husband to abandon her, the defendant, with the same motive and intent, have kept him away from her; and that such conduct on their part caused her husband's affections to be alienated and that she has been deprived of his support, society, etc. It will be further seen from that report that the judgment was reversed and the cause remanded by a majority of the court, principally for the reason that the instructions for plaintiff did not submit the hypothesis of defendants conspiring and co-operating in the malicious conduct charged against them; though Judge BROADDUS thought that was immaterial in view of the fact that, in his opinion, no case was made against defendants as charged and that the judgment should, for that reason, have been reversed without remanding.

The evidence at the last trial, with an important exception, was substantially the same as at the first. There were some changes made by the plaintiff in portions of her testimony, the motive for which is strongly impugned by defendants' counsel, and, it seems to us, not wholly without cause. There was also some evidence consisting of conversations with defendants which is of little moment in the view we have taken of the case. There was also some evidence of statements of plaintiff's husband made out of the presence of defendants which we consider to be harmful and reversible error. [Westlake v. Westlake, 34

122 App—42

Ohio State 634.] There was also error in instruction numbered 3, given for the plaintiff in which all question of malice is omitted and a verdict directed for her if defendants merely co-operated together and intentionally enticed or persuaded plaintiff's husband to separate from her. [Barton v. Barton, 119 Mo. App. 507, 94 S. W. 574, 582, as well as the authorities to which we shall hereinafter refer.] There was also cause for a new trial in improper remarks of plaintiff's counsel in addressing the jury.

On the first appeal, it was with much misgiving that I arrived at the conclusion that a case had been made for the jury. At this time, in view of plaintiff's written admission of her conduct towards these defendants in a note addressed to them, which was not in evidence at the first trial, and was only referred to as containing an invitation to defendants to visit her; in view of her own testimony at the last trial and considering that the defendants are the father and mother of plaintiff's husband and the absolute necessity for her to show that they were actuated by malice, rather than an honest interest in the welfare of their son, we have concluded that no case has been made.

What is malice? As known to the law, it is a wrongful act done intentionally, without just cause or excuse. [Goetz v. Ambs, 27 Mo. 28.] It is not merely doing an act intentionally which is wrongful, but it must have been known to be wrongful. [Trauerman v. Lippincott, 39 Mo. App. 478.] We understand this view to have met the approval of the Supreme Court in McNamara v. Transit Co., 182 Mo. 676, though the court approves the form of an instruction which submits the act as "intentionally done;" holding that that would indicate to the jury that the party charged knew that the act was wrong and that he had no just cause or excuse for doing it. So, therefore to make out a case against these defendants the evidence must not only show that they did the acts which plaintiff insists caused the alienation of their

son's affection for her, but it must show that they knew the acts were wrongful and done for the purpose charged. That such showing should be made is apparent from authorities hereinafter cited.

In considering whether such showing was made, it is of the greatest importance to keep in view that the defendants were the mother and father of plaintiff's husband and of the plaintiff's conduct towards them, for her conduct may explain or account for their actions. And it is also necessary, from the fact that proof of malice need not consist of open and affirmative declarations, but may be made out by conduct, and acts. In order to properly characterize one's actions or conduct, it is necessary to consider the circumstances, situation and relationship which exist. Thus, as affecting a married couple, acts and conduct of a stranger which would be justly characterized as those of a malicious intermeddler, might be but the natural impulse of the parents which would be set down to their credit by all right thinking people. This is the view of all the authorities which we have found where the relationship of the defendants has been considered. [Hutcheson v. Peck, 5 Johns. 196; Tucker v. Tucker, 74 Miss. 93; Payne v. Williams, 4 Baxt. 583; Rice v. Rice, 104 Mich. 171; Burnett v. Burkhead, 21 Ark. 77; Huling v. Huling, 32 Ill. App. 519; Smith v. Lyke, 13 Hun 204; Brown v. Brown, 124 N. C. 19.] In the case first cited, Ch. J. KENT said that, "If the defendant did not stand in the relation of father to the plaintiff's wife I should not perhaps be inclined to interfere with the verdict. But that relationship gives rise to a new and peculiar interest. . . . A father's house is always open to his children; and whether they be married or unmarried it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum, and according to Lord COKE, it is 'nature's profession to assist, maintain and console the child.' I should require, therefore,

more proof to sustain the action against a father, than against a stranger. It ought to appear, either that he detains the wife against her will, or that he entices her away from her husband from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed. This principle appears to me to preserve, in due dependence upon each other, and to maintain in harmony, the equally strong and sacred interests of the parent and the husband. The *quo animo* ought, then, in this case, to have been made the test of inquiry and the rule of decision." In the case last above cited, it was said that, "It cannot be that the law disregards the tender relations of kinship and natural affection between parent and child and the duties which such relations impose, even though the child is married. In case of unhappiness and disagreements between the married couple, it is almost impossible to conceive of the indifference on the part of the parent to such conditions, and certain it is that the child naturally turns to the parent for comfort and advice under such circumstances. There are laws of natural affection and of natural duty, and municipal law will not obstruct their free operation as long as they are not abused. The presumption in fact and in law in all such cases must be, and is, that the parent will act only for the best interest of the child and for the honor of the family."

Every legal presumption is that the parent acted for the best interest of the child. [Reed v. Reed, 6 Ind. App. 317.] Can it be said that if a parent shall advise his child in good faith, he does so at the risk of financial ruin? "It would be strange, indeed, if parents, under peril of legal consequences, must keep silence under such circumstances, or must clothe in terms of respect their expressions of outraged feeling, when even strangers would be excused for speaking with freedom." [White v. Ross, 47 Mich. 172.] So it has been ruled that a

parent acting in response to natural affection may, in good faith, advise his child in favor of a separation, if justified by his information, although such information may be unfounded. [Bennett v. Smith, 21 Barb. 439, 443, 445.] This court has ruled, in an opinion of the presiding judge, that there was a broad distinction to be made between the acts of a stranger interfering with marital relations and acts of parents. [Love v. Love, 98 Mo. App. 562.] And it was likewise so stated by the St. Louis Court of Appeals in Barton v. Barton, 119 Mo. App. 501, 94 S. W. 574. Parents, may, of course, be guilty of maliciously separating their married children and thereby render themselves liable in damages. As in Nichols v. Nichols, 147 Mo. 387, where they took the initiative and avowedly separated them, by taking them apart and writing and having. published notices in the son's name forbidding any one to trust or harbor the wife.

Plaintiff lived with defendants at their home from the next day after their marriage, April 1st, until August 18th, except a few weeks that she was employed to assist her husband's married sister who was sick. On August 18th, she and Garfield went to housekeeping in the village about a mile distant. The case made to show the guilt of these defendants as charged by her, consists principally, according to her own testimony, of three conversations. The first occurred on June 20th; the second, on July 5th, and the third just before she went to housekeeping in August. On June 20th, she says she heard Mrs. Leavell tell Mr. Leavell just before dinner that she (plaintiff) was so disagreeable — that she had been pouting and sulking all morning. And at dinner that Mrs. Leavell said to her, "I guess the cat has got your tongue to-day; you haven't said anything." And she said that she did not feel very well and did not feel like talking. After dinner Garfield and his mother went into the cellar to get some fruit cans and she went into a room above just in time to hear her name and to hear

Mrs. Leavell say, "I will not have it. I will knock it out of her." That was all she heard, but she says she thought Mrs. Leavell meant her on account of what she had said about her pouting and sulking. On hearing this, she says she went into the kitchen and was crying when Mrs. Leavell came up and said to her, "What is the matter with you now?" She answered, "every thing, and I said, seemed like they were all against me, and I hadn't no friend, no one to turn to, and they had got Garfield so I could not talk to him." She says Mrs. Leavell asked her, "Why don't you leave him then; you had better go to your mother where you ought to be?"

The next occurrence, July 4th, she says she overheard Garfield say to his mother (referring to the other married children) that "to-morrow, Cora and her husband, Tommie and his wife, and me and my wife, and they both sneeringly laughed when he said me and my wife, will take dinner with you to-morrow, and he says, 'It will be the last 4th of July I will *stop with you*,' and she said, 'I should think so.' " She stated that Mr. Leavell was over the fence near by. Further on in her testimony she stated this incident again, in which she had heard Garfield saying that, "It will be the last 4th of July I will *spend with her*," and Mrs. Leavell replying, "Well, I think so."

The next complaint, in August just before the housekeeping began, she was in her room upstairs at night, while Garfield and his mother were in the kitchen below and again she heard her name spoken, but she could not distinguish in what connection. Garfield came up and next morning when he and she came down to breakfast Mrs. Leavell told her she had heard her crying in the night and she said it was because Garfield had told her that she was to go to housekeeping. Mrs. Leavell then asked her what she thought about going to housekeeping, and that she made no reply. When Garfield said, "I will get a house and get her away just as soon as I can."

Mrs. Leavell then said, "We think it better for her to be to herself, and we think it would be better for her to have her away to herself before this happened." That Garfield said in presence of his mother and father there would be no necessity for taking "any of his things" to the house and Mrs. Leavell said, "No, there is no use you taking your things at all, I will do your washing here and you will be here and take your meals; we have got to have you out here, you can't stay and wait for her to get up and get breakfast." Other portions of the evidence showed that the defendants were old and that Mr. Leavell could not see very well and was hard of hearing, and that they were paying Garfield for working for them and doing the early and late work necessary on a farm, which made it necessary for him to leave his house (after the housekeeping began) before breakfast and to return after the chores at his father's farm had all been done.

The foregoing is the chief matter to establish the defendants' guilt of the charge made against them until the housekeeping began. The evidence thence on, on plaintiff's part consists in an effort to show how Garfield neglected her during and after her confinement and finally she, on account thereof, went to a hotel in the village to work. The only reference to these defendants is that they did not go to see her, Mrs. Leavell saying she thought it better not to do so. All other testimony as to the conduct of defendants while she lived with them may be summed up in her statement that they treated her "slightingly," or with "coldness," by saying that she was "stubborn and didn't do things nicely." And Mrs. Leavell complained that she should stay in the house more; "such things as that."

We do not think, even considering this evidence disconnected from what we shall refer to as appearing in other parts of plaintiff's testimony in her own behalf, that there is any showing of co-operation to do a wrong-

ful act in malice; or that there is any evidence at all of malice. Indeed, considering the circumstances, we are fully persuaded that there are few people who would have acted as properly and discreetly as these defendants. During the course of nearly five months there is but the three inconsequential episodes occurring in the life of these two families living in the same house.

The first complaint as to hearing some disconnected words on the 20th of June between Garfield and his mother in the cellar. There is nothing more than conjecture that these words referred to plaintiff. And when Mrs. Leavell came upstairs and found plaintiff, as her inquiry shows, in her customary mood, asked, "What are you crying about *now?*" and received in reply plaintiff's accusations against her. It was at this time that Mr. Leavell came into the room and Mrs. Leavell told him plaintiff was again quarrelling and he then stated "that if she could not do any better than that she could leave and work out awhile," and that if he had known what he then knew Garfield should not have married her, and that he should not get anything if he went with her, but, if he stayed with them, he could get what the other children got. This, at most, was but the expression of impatience with plaintiff's conduct, and was a meaningless exhibition of anger. That he did not mean to force her from the house or to separate her is conclusively shown by his not doing so and by what he afterwards did. If every impatient threat of a father to an annoying child should be made the ground of an action against him the courts would not find time to listen to much else. In White v. Ross, 47 Mich. 172, the father said to his son-in-law in a fit of anger that if his daughter went with him he would shoot them both, yet his subsequent conduct showed that this was not meant, as he agreed that if she would remain at home a week and then decided to leave she could do so. And before the week expired she decided to abandon him, yet Judge

COOLEY thought no case was made. So it was held that the father might advise his son not to live with his wife if she joined a certain church. [Rice v. Rice, 104 Mich. 371.] In Young v. Young, 8 Wash. 81, the husband's father hearing the wife say she had not been happy since she "had been here," replied that she "could get up and get out," and afterwards said to her that she had to go, together with evidence that he would disinherit the son if he lived with her, was not sufficient to sustain a judgment for plaintiff notwithstanding the parents permitted the husband to remain with them.

Plaintiff made two widely different statements of her second complaint as to the conversation overheard about the 4th of July dinner. The second one of these amounts, at most, to a statement from Garfield that he would not spend another 4th of July with plaintiff and Mrs. Leavell's acquiescence, thereby leaving the inference that he did not intend to continue to live with her, certainly does not show that Mr. and Mrs. Leavell were wickedly, wantonly and maliciously instigating him to leave her. Mr. Leavell, who, as already stated, the evidence shows to be hard of hearing, was in another lot, several feet away, and ought not to be charged with co-operating in the assent of Mrs. Leavell to Garfield's statement. There is no pretense that he heard the remark. But it is somewhat remarkable that in her first statement of the occurrence, she said that she heard Garfield say to his mother that it was the last 4th of July that, "I will stop with *you;*" which, manifestly, could not bear on the case at all.

The third matter of complaint relates to her going to housekeeping. As she told of this complaint on the first trial, it amounted to not the slightest consequence as regards the charge against the defendants. She then repeatedly stated that Mrs. Leavell stated that "we" (that is, she and Garfield) should go to housekeeping. But as told on the last trial, she put in that *"she"*

should go to housekeeping. Even accepting the last version as the true one, it is at once seen to be of no consequence, and as evidently meaning both of them.

We are aware that while separate acts or separate lines of conduct may not show malice, a number of acts, considered together, may show a purpose which would not appear when considered separately. But in this case the evidence fails considered in either way.

It is apparent from the testimony given by the plaintiff as to what these defendants said to her that she quarrelled with them, though they were old people and were sheltering her in their own house, and she affirmatively admitted that she did so, though she said they were the cause. Not only that, but after the child was born, she wrote them the note above referred to, which we regard as a confession of her own wrong. And as fully explaining the conduct of these defendants of which she complains. It reads: "Father and Mother Leavell: I write asking your pardon and forgiveness for all I have said and done to cause any hard feeling. Please come and see our baby. Pearl." Furthermore, she admits that Mr. Leavell procured a house for her and Garfield and moved them into it and furnished them with a housekeeping outfit and that he afterwards bought a house and moved them into it and that during all the time they were housekeeping defendants supplied the table. She further admitted on the morning of their moving, the old gentleman advised them to get along peaceably, not to quarrel, and that the way to be happy was to live in peace. In the face of all the evidence in her behalf, it is incredible that defendants could have been the wicked and malicious conspirators conspiring and designedly forming plans for the malicious purpose of separating her from Garfield. The testimony as given by plaintiff is greatly discredited by the standpoint from which she viewed her rights and those of these defendants. The whole face of her testimony shows that she thought the

defendants owed her shelter and support and that they should have treated her with great deference. In other words, that they should have swallowed the disgrace and humiliation she had brought upon them and looked and acted as though pleased over it. It shows that she considered them responsible for the consequences of her and Garfield's sinful indiscretion and that unmindful of her part in blasting the end of the life of these old people, they should impoverish themselves by paying her damages for Garfield's neglect.

In disposing of the case, we have not considered the denials made by defendants of the charges which plaintiff sought to sustain. Nor of the testimony of many witnesses in their behalf tending to show their conduct to have been blameless. We have only taken into consideration those things in the entire record which have been claimed to support the plaintiff and we find that she has failed to make out her case and hence we reverse the judgment. *Broaddus, P. J.,* concurs; *Johnson, J.,* believes the judgment should be reversed and the cause remanded, and therefore dissents as to reversing the judgment without remanding.