[S. F. No. 7135. Department Two.—March 29, 1917.]

## CECILE B. HALL, Respondent, v. WILLIAM HALL et al., Appellants.

HUSBAND AND WIFE—ALIENATION OF HUSBAND'S AFFECTIONS—ACTION AGAINST PARENTS OF HUSBAND—EVIDENCE.—In this action by a wife against her husband's parents to recover damages for the alienation by them of her husband's affections from her, the evidence is held insufficient to sustain the verdict in favor of the wife.

ID.—DEGREE OF PROOF.—To sustain an action for damages against par-
ents for the alienation of the affections of their married child
from his or her spouse the measure of proof must be extremely
high.

APPEAL from a judgment of the Superior Court of Santa
Cruz County, and from an order refusing a new trial. Lucas
F. Smith, Judge.

The facts are stated in the opinion of the court.

Chas. M. Cassin, and James L. Atteridge, for Appellants.

Beggs & McComish, H. C. Jones, and C. C. Houck, for
Respondent.

HENSHAW, J.—Plaintiff sued defendants, who are re-
spectively the father and mother of her husband, to recover
damages for the alienation by them of her husband's affec-
tions from her. The charge was that "The defendants will-
fully, wrongfully, wickedly, unjustly and maliciously contriv-
ing and intending to injure plaintiff and deprive her of the
affection, support, comfort, fellowship, society, aid and as-
sistance of plaintiff's husband . . . alienated and destroyed
the affection of said Robert Hall, the husband of this plain-
tiff for this plaintiff, . . . and did willfully, illegally and
maliciously entice, abduct and persuade said Robert Hall from
plaintiff, whereby plaintiff has wholly lost and has been de-
prived of the assistance, comfort, fellowship, society, aid and
support of said Robert Hall." Trial was had before a jury,
which returned its verdict in favor of plaintiff in the sum of
ten thousand dollars. From the judgment and from the order
of the court denying their motion for a new trial, defendants
appeal.

Upon appeal their principal effort is directed to the con-
tention that the evidence is wholly insufficient to justify the
verdict, and this effort, it may be said at the outset, is wholly
successful. Seldom, indeed, is it that a reviewing court is
called upon to consider a verdict such as this, whose evi-
dentiary foundation is airy nothingness, not even the base-
less fabric of a vision.

Plaintiff and her husband, Robert Hall, were married in
Los Gatos, Santa Clara County, in November, 1906. At the

time of their marriage the husband was about twenty-six years of age, the wife a few years younger. Her parents were living in Los Gatos, so were his. He seems to have been an only child. His father and mother had been married more than fifty years, and at the time of the trial of this action the father was seventy-five years of age and the mother sixty-eight years of age. They owned their own home. They had some property. They were frugal, and the old wife did all of the household work. The narration which follows is that of the plaintiff. Following their marriage in the latter part of November she and her husband went to San Jose. Her husband's parents came to them and begged them to come and live with them in Los Gatos, Mr. Hall saying that his wife would teach the bride economy. Apparently the wife had no means; the husband was earning about seventy-five dollars a month. The newly married couple went to Los Gatos and began housekeeping in rooms not far from the home of the elder Halls. They were visited quite frequently by the latter, old Mrs. Hall urging that the young people come and live with them; saying that the cost of living was high and they could live more cheaply together. They did not comply with the Halls' request, however, but continued to live as they had been doing until the husband went into the near-by mountains under employment as a wood-chopper, and the wife went to live at her parents' home. During this time, when the husband was free from his mountain labors, he returned to and lived with his wife. One painful incident occurred during this time. The husband and wife were making a call upon his parents. The mother was urging that they should come there to live. Robert said that he didn't think they would; "then she began screaming and raving about me; that I was trying to keep Robert away from her. They put her to bed and worked with her for some three hours. She insisted that Robert stay all night with her, and as I was not wanted I started home, and after I started I discovered I had not the key, and I came back to get the key, and Robert came on home with me." Plaintiff is a school teacher, and obtained a position as such to teach a country school distant from the city of San Luis Obispo about thirty miles. Her school term began in July and ended in November. Her husband went with her to the city of San Luis Obispo, and for his own improvement took a course in a poly-

technical school there situated, while his wife went to the country to teach. Every week, usually on Friday afternoon, he rode his bicycle thirty miles to be with her over the week's end. While there she took from her husband's suitcase and read certain letters written to him by his father. She was permitted to give secondary evidence of the contents of these letters. She said that in them her husband's father accused her of being "wasteful and extravagant" and "a hindrance to Robert's spiritual development"; that he ought to separate from her; that the letters often contained the quotation "Be not unequally yoked with unbelievers." He urged his son to "take the paper route by all means for twenty dollars a month, but do not let Cecile know how much you are getting, and once in awhile, in case of absolute necessity, I will slip in a little." The letters told her husband to keep her there teaching, "that would be a good lesson in economy for her." Another letter said: "Let Cecile come on home and I will meet you in San Luis and together we will take a trip in Madera County, but don't let Cecile know I am coming. You will know how to manage that." It is pertinent here to add that the father denies having written and the son denies having received letters of such import. Certain trips made by father and son together are complained of by plaintiff, as, for example, she persistently calls a trip which her husband and his father made to Los Angeles as their "wedding trip." The explanation of these trips is that the father was earnestly seeking to establish the son in some profitable business, and his wife was unwilling to go on these trips with them. In December, 1907, they returned from San Luis Obispo to Los Gatos and took up their abode in the home of defendants. Plaintiff was pregnant. As the date of her confinement approached she told her mother-in-law that she expected the arrival of the little grandchild, and the mother-in-law "sat back in her chair with utter scorn and disgust on her face and never said one word." She asked her mother-in-law if she might stay in her home during the period of her confinement and convalescence and her mother-in-law replied, "Yes; you may stay here, but you must not be a trouble to me." The aged mother-in-law's account of this interview was that she looked forward to the birth of her grandchild with great interest; that she told her daughter-in-law that she could stay there if she desired,

"but there are some things I cannot do for you." So the daughter-in-law went to a sanatorium, where she was confined. On leaving the sanatorium, about the middle of July, 1908, she did not return to the Halls, where her husband still was, but went to her mother's, where she remained until in August, 1908, she and her husband moved to San Jose. There they resided until June, 1909. The defendants visited them not infrequently, and her father-in-law paid at least in part for the furniture in their San Jose home. In June, 1909, they returned to Los Gatos, moved by consideration of the baby's health. The husband continued in his employment in San Jose, and went back and forth on the interurban cars. They lived in their own home. The principal complaint of the conduct of the husband during this time is that, returning to Los Gatos from San Jose, he usually went first and directly to the home of his parents and spent some time there before returning to his own. Sometimes he took his supper there. The explanation is that the son spent his time helping his aged father and mother in the work about the place, and that when he took supper with them it was because he preferred to do this rather than to get his own supper at home, as frequently he was obliged to do because of his wife's absence at her mother's home. Their residence in Los Gatos continued until January, 1911. During that period of time between 1909 and 1911 plaintiff asked the Halls at sundry times many questions. She asked Mr. Hall, Senior, "Why two months after we were married he suggested to my husband that I married him for his money, thus poisoning his mind against me. Mr. Hall's reply was, 'Well, what do you think we thought you married him for? People call me a millionaire and people are after my money. What else do you think I thought you married him for?'" But elsewhere she testifies that the elder Halls hailed her marriage to their son with great delight. Again she asked Mr. Hall "why he suggested to Robert that we were not mated by constantly suggesting to him we were not mated. He said he didn't think we were mated, and he considered it his duty to separate two people who were not mated. Again I asked Mr. Hall why he was a party to offering me one thousand dollars in March, 1907, to leave my husband and telling me I could go as a missionary if I wanted to. Mr. Hall's answer was— coolly sat back and said he supposed it was because they

wanted me to go, and Mrs. Hall said, 'Do you think we wanted you to go without anything?' '' There is more to like effect, all of equal inconsequence, and the defendants deny that such conversations ever were had.

The separation between the plaintiff and her husband came as indicated in January, 1911. During all of their married life, as the evidence discloses, he had neither neglected his wife nor been unkind to her in any way. He did not drink. His absences from home were only those upon the short business trips made with his father, or when his labors called him away, or when he stopped at his parents' home to help them before returning to his own. He contributed all of his earnings to the support of his wife and child. He seems to have indulged his wife in every way, and when the separation came, which was in fact her abandonment of him, he ''told her to take her own way. I let her have her own way all the time.'' In January, 1911, she sold the furniture in their home, took this money, and with her child departed, leaving her husband weeping in the house. To the sum which she received from the furniture he added twenty dollars. He went to his parents' home. She stayed two weeks in the near-by town of Campbells and then went to Capitola, a summer resort on Monterey Bay, and remained there until the middle of the summer. She returned from Capitola to Los Gatos, and in September secured a position as school teacher in the county of Fresno. She went there and taught until the following May. While at Capitola she wrote to her husband, telling him where she was, and he came down to see her for the purpose of effecting a reconciliation. He met with no success. Upon another occasion he asked her to join him and his father in the town of Morgan Hill, where it was proposed to look at ranch property with a view to settling the young people. She went, remained with her husband one or two nights, but soon left, as ''I wanted to get back to Capitola to attend a meeting of the Young Women's Christian Association that was shortly to convene down there.'' A second time her husband visited her at Capitola, but left when she told him that her father was coming to the house. Her parents disliked her husband very much, and she did not want them to know that she communicated with him. She went to Fresno and did not let her husband know where she had gone, nor for many months was he able to learn,

notwithstanding his efforts to locate her. She testifies that she did not want him to know, and for explanation justifying her conduct says that it was because her husband "said he would shoot the county full of holes. Now, do you wonder that I didn't want him to know?" She wrote to her husband but once while she was in Fresno, and returned from there to Los Gatos in May, 1912. She immediately began to take steps looking to a divorce and to securing money from her husband, which money, of course, would come from his parents, as it is not asserted that he had anything other than his earning capacity. She planned to use this money to build a home. Some sort of tentative arrangement seems to have been entered into by which she was to receive a thousand dollars. In one of these letters she writes to her husband as follows: "These are my terms: 1. The guardianship of Lawrence; 2. The payment to me of the thousand dollars you once offered me, not for my own use this time, but for Lawrence's care. Has it ever occurred to you that you could be arrested for felony for not having given anything for Lawrence's support for over a year?" The greater part of the year to which reference is here made was the period when she had taken the child, had abandoned her husband, and had even concealed from him her whereabouts. The Halls seemingly thought that this thousand dollars, as under the mother's declaration it was to go for the maintenance of the child, would better be paid in monthly installments, and this called forth from the wife a letter, from which the following extracts are taken: "You seem to think you have the power to make or unmake terms as you see fit, and I have nothing to say, but only accept. Let me say right here that I am not going to do anything of the kind. . . . Those days when I took Lawrence on the beach (at Santa Cruz) to see you were the most miserable days I ever put in; and so was the whole time. If you hadn't spent so much time crying, and if I hadn't felt sorry, I should never have stood it for a minute. Then you would keep saying, there was no other way but a divorce so you could start all over again, and if I didn't start proceedings you would. To support what I previously said about the stay in Santa Cruz being a most unpleasant vacation; Lawrence and I did not go home, but we went to Capitola and had a real vacation. . . . My sister-in-law got $5,000 damages, and didn't half try, and the $1,000

is beginning to look mighty little to me. I might just tell you that a prominent business man in this town has hired the best lawyer in San Jose for me, and he is now consulting with Mr. Jones. . . . I said to them this afternoon that if you would live up to your part of the agreement and pay $1,000 in addition to the $500 already paid, I would live up to mine. That $1,000 was not to be paid in monthly pay'ts. Nothing was said about such an arrangement. If you feel free to go back on your word I shall feel free to act accordingly. Furthermore, it was to be in my name.''

Certain other facts here merit notice. She charges that the malign influence of her husband's parents was exercised upon him immediately after the marriage and continuously from that time on. Yet she had no differences, no wordy quarrels with the senior Halls during the six months that she lived in their house. Before she went there to live, it will be remembered, she had been teaching school in San Luis Obispo County, and it was while there she read the letters from Mr. Hall, her versions of which have been given. Yet she writes to ''Dear Mother Hall'' a chatty and affectionate letter which closes with ''Lovingly yours.'' When she abandoned her husband in 1911 she wrote to him that, ''I want to love you again, but it just seems as though I am groping blindly in the dark trying to find something on which to base that love.'' In no one of her letters is there even a suggestion that the unhappiness which darkened their marital relations was occasioned because of the loss of the husband's love for her, still less by reason of the pernicious activities of these defendants directed to that end. One of these letters to her husband, dated October, 1912, contains this sentence: ''Robert, I believe just between you and me that our folks, while not meaning to be, are hindering rather than helping us. I say this with all regard to them for they do not realize it, but we ought to realize it and rise above it.'' Her explanation of this sentence, written after all of these difficulties, is neither satisfactory nor illuminating. Notwithstanding the fact that she testifies that her parents disliked her husband, she insists that the language ''our folks'' had exclusive reference to his parents. For the rest, she asserts that this declaration had nothing to do with the ''willful, wrongful, wicked and malicious'' efforts which her parents-in-law were, she charges, persistently making in their

effort to destroy her husband's affection for her. One other episode calls for narration. In 1912 the senior Halls with their son Robert had gone to Santa Cruz and were there living together. This plaintiff, returning from Fresno County to Los Gatos, discovered this fact. She filed her complaint for a divorce in Santa Cruz County. After so filing it she herself went to Santa Cruz County. She accepted her husband's invitation to come to his home, which was also the home of his parents, and there spent one or more nights with him. While they were at the dinner-table her husband was served with the complaint and summons in her suit for divorce. After that she again visited her husband at his parents' home, upon this occasion Mrs. Hall, senior, being present. She was not at home on the occasion of the dinner-table episode. Mrs. Hall saw her son with his arm around the plaintiff's waist. According to plaintiff her mother-in-law screamed and said, "They will be reconciled again and my troubles will all begin over." The senior Mrs. Hall's explanation is that she thought and declared that such conduct upon the part of a woman was not proper in contemplation of the fact that she was prosecuting an action for divorce against the man who was embracing her.

This ends a fairly complete *résumé* of the evidence in the case, saving that it should be added that upon its trial, while the wife admitted her loss of affection for her husband, he declared his continued love and devotion to her. It is quite plain that if plaintiff had brought this action because of the alienation of her affections from her husband it would stand, so far as the evidence at least goes, upon a much firmer basis than does the one which actually she did bring. For here is a case where, without hesitation, it may be said that the evidence fails to show either an attempt to alienate the husband's affections or any success for that attempt, if it were actually made. It would be a work of supererogation to dwell at length upon the governing law of cases such as this. It is sufficient to state it briefly, with due reference to the authorities, when at once the utter inadequacy of this evidence will be apparent, if it has not already become so. Actions for damages against parents for the alienation of the affections of their married child from his or her spouse are frequent in the law, and the principles governing the introduction of evidence and the weight to be given it are well

settled. Having in contemplation the natural solicitude of the parent for the child, and the well-nigh universal experience of mankind that parents in their conduct toward their children are actuated by high and disinterested motives, involving the sacrifice of their own interests for the welfare of the child, it is not to be lightly inferred that the language or conduct of such a parent toward a child is prompted by evil and malicious motives. Therefore, to establish such willful and malicious alienation, "the measure of proof must be extremely high." (*Beisel* v. *Gerlach,* 211 Pa. 232, [18 L. R. A. (N. S.) 516, 70 Atl. 721].) Says Chief Justice Kent in *Hutcheson* v. *Peck,* 5 Johns. (N. Y.) 196: "If the defendant did not stand in the relation of father to the plaintiff's wife I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives rise to a new and peculiar interest. . . . A father's house is always open to his children, and whether they be married or unmarried it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum, and, according to Lord Coke, it is 'nature's profession to assist, maintain, and console the child.' I should require, therefore, more proof to sustain the action against a father, than against a stranger." But "every legal presumption is that the parent acted for the best interest of the child." (*Leavell* v. *Leavell,* 122 Mo. App. 654, [99 S. W. 460] ; *Reed* v. *Reed,* 6 Ind. App. 317, [51 Am. St. Rep. 310, 33 N. E. 638].) Quite like the present case in its facts is that of *Busenbark* v. *Busenbark,* 150 Iowa, 7, [129 N. W. 332], where, after setting forth at great length, as has been done here, the annoying interference of the parents-in-law, the court said: "The incidents which are described as above set forth in plaintiff's testimony appear to us as very commonplace. They may have been unwise and lacking in delicacy and tenderness, but there is nothing to indicate that they were otherwise than the natural expressions of solicitude of this mother-in-law. Parents often annoy their children with advice, good and bad. The good is often quite as annoying as the bad. This mother-in-law seems to have fought the battle of thrift in a certain way, and she was quite sure that it was the only safe way." And without amplifying these quotations reference may be made to *Codoni* v. *Codoni,* 6 Cal. App. 83, [91 Pac. 423] ; *Cripe* v. *Cripe,* 170 Cal. 91, [148 Pac. 520] ;

*White* v. *Ross,* 47 Mich. 172, [10 N. W. 188]; *Brown* v. *Brown,* 124 N. C. 19, [70 Am. St. Rep. 574, 32 S. E. 320]; *Rice* v. *Rice,* 104 Mich. 371, [62 N. W. 836]; *Pollock* v. *Pollock,* 9 Misc. Rep. 82, [20 N. Y. Supp. 37]; *Fronk* v. *Fronk,* 159 Mo. App. 543, [141 S. W. 697]; *Park* v. *Park,* 40 Colo. 354, [91 Pac. 830].

The jury after it retired to deliberate upon its verdict came into court seeking further light upon the law, as shown by the following questions asked of the judge:

"Question by a juror: The question is, Judge, in the event we should award damages, will that be protecting the child; should we award damages would there be compensation, protection for the child; would the child be sure of protection? That may be entirely foreign to what we are expected to do, but the argument came up."

"Another juror: That may be foreign to what we are asked to come here for, but we seem to want to know about it."

"Another juror: There has been considerable argument; some of the jurors argue one way, some another, and the question came up, provided any damages were awarded to the plaintiff, would the boy be protected by the court in any respect. The supposition was that probably the plaintiff might marry and the boy would lose any protection which we might accord him."

This transcript from the record affords the only understandable reason for the verdict given. It is but another exemplification of the power which some juries assume of adjusting, without regard to the evidence or issues, the finances of the litigants in accordance with their views. It is another case like that of *Driscoll* v. *Market St. Cable Ry. Co.,* 97 Cal. 553, [33 Am. St. Rep. 203, 32 Pac. 591], where, as this court said, "a jury catches at a mere semblance or pretense of evidence for the purpose of simply equalizing financial conditions by taking money from one party and giving it to the other without legal cause." But in this case, no more than in that, has this great and, to the jurors, most inexpensive generosity the sanction of the law.

The judgment and order appealed from are therefore reversed.

Melvin, J., and Lorigan, J., concurred.