SPIRY, Respondent, v. SPIRY et al, Appellants.

(199 N. W. 778.)

(File No. 5525. Opinion filed June 27, 1924.)

1. **Husband and Wife—Evidence—Alienation of Affections—Evidence Held Not to Sustain Verdict Against Parents for Alienation of Husband's Affections.**

   In action for alienation of affections of plaintiff's husband, against his parents, evidence held not to sustain verdict for plaintiff.

2. **Husband and Wife—Presumptions—Evidence—Mere Interference by Parents in Domestic Affairs Does Not Constitute Alienation of Affections, Unless Unjustifiable, Which Must Be Clearly Proved.**

> Since the presumption is strong that parents will act honestly
> and for the best for their children, their interference in their
> domestic affairs does not constitute alienation of their affec-
> tions, unless unjustifiable and proven so in no uncertain man-
> ner, and mere proof of opportunity is insufficient.

3.  **Appeal and Error—Evidence—Hearsay—Plaintiff's Testimony as
    to Husband's Statement Held Hearsay and Prejudicial Error
    in Wife's Action for Alienation of Husband's Affections.**

> In action for alienation of husband's affections, against his
> parents, admission of evidence that as reason for not living
> with plaintiff husband said he "didn't dare to" held prejudi-
> cial error as hearsay, and as invading the province of the jury,
> especially where the statement was made prior to settlement
> of prior suit.

4.  **New Trial—Newly Discovered Evidence—Motions—Newly Discov-
    ered Evidence Held Not to Require New Trial.**

> Newly discovered evidence that defendants were not present
> when a transaction testified to by plaintiff took place held in-
> sufficient to require new trial, in the absence of a showing that
> evidence could not have been produced at the trial.

Appeal from Circuit Court, Walworth County; Hon. J. H.
Bottum, Judge.

Action by Bertha Spiry against Fred Spiry and wife, for
damages for alienating affections of plaintiff's husband. From a
judgment for plaintiff and order denying a new trial, defendants
appeal. Reversed.

Supreme Court Judges POLLEY, GATES, and SHER-
WOOD deeming themselves disqualified from taking part in the
decision of this action, Circuit Judges N. D. BURCH, W. N.
SKINNER, and FRANK B. SMITH were selected to act in place
of the aforesaid Supreme Court Judges according to chapter 343,
Session Laws of 1919.

*W. M. Potts,* of Mobridge, and *McNulty & Campbell,* of Ab-
erdeen, for Appellants.

*Morrison & Skaug,* of Mobridge, and *H. O. Hepperle,* of
Aberdeen, for Respondent.

(2)  To point two of the opinion, Appellants cited: Cooper
v. Cooper, 102 Kan. 378, 171 Pac. 5; Bourne v. Bourne, 43 Cal.
A. 516, 185 Pac. 489; Multer v. Knibbs, 193 Mass, 556, 79 N. E.
762, 9 L. R. A. (N. S.) 322; Beisel v. Gerlach, 221 Pac. 232, 70
Atl. 721, 18 L. R. A. (N. S.) 516; Gross v. Gross, 73 S. E. 961,
39 L. R. A. (N. S.) 261.

(3)   To point three, Appellants cited:   Gilmore v. Gilmore, 42 S. D. 236, 173 N. W. 865; Cochran v. Cochran, 111 N. Y. S. 588; Luick v. Erends, 21 N. D. 614, 132 N. W. 353.

Respondent cited:  Smith v. Smith, 42 S. D. 205, 173 N. W. 843; Elmer v. Fessenden, 24 N. E. 208, 5 L. R. A. 724; Hardwick v. Hardwick, 130 Iowa 230, 106 N. W. 639; Lockwood v. Lockwood, 67 Minn. 476, 70 N. W. 784; White v. White, 140 Wis. 538, 122 N. W. 1051; Perry v. Lovejoy, 49 Mich. 529, 14 N. W. 486; Hillers v. Taylor, 81 Atl. 286; Rose v. Mitchel, 43 Atl. 67; Clendennen v. Bainbridge, 187 N. W. 727.

FRANK B. SMITH, Circuit Judge.   The plaintiff is Bertha Spiry, who before her marriage was Bertha Schlep, and her parents are Germans, and her husband and his parents are Germans, all living on farms in the same vicinity in Walworth county.

Along in the last part of her eighteenth year plaintiff became pregnant as a result of sexual relations with some one.   Samuel Spiry, the son of the defendants, and who afterwards became the husband of the plaintiff, was then about 19 years of age, and she and this young man had been acquainted something like a year at the time she became pregnant.   Some length of time after she became pregnant she accused Samuel Spiry of being the father of the child, and charged him with, and had him arrested for, statutory rape, very probably at the instigation of her parents, and in March, 1920, he was tried and convicted of the crime of rape in Walworth county and sentenced to 6 years in the penitentiary. The plaintiff testified against him upon such trial.   Immediately after the sentence was pronounced all parties got together and the matter was fixed up, whereby Samuel Spiry, in order to avoid execution of sentence, went before the presiding judge and stated that the child was his and agreed to marry the plaintiff, and on the 25th day of March, 1920, he and the plaintiff were married and the defendant herein, the father of Samuel Spiry, paid the father of Bertha Schlep, $350, representing attorneys' fees which Mr. Schlep had paid for counsel to assist in the prosecution of Samuel Spiry.

After the young people were married, they went to the home of Bertha's father, and Sam remained there about a week, when he went to work for his father until in May of that year, visiting his wife on Sundays.   There was some friction between

Sam and Bertha's parents in regard to Sam not staying with her all of the time, and in May, 1920, Sam left the country, apparently without the knowledge of any one, and went to Oregon, and remained away until in March, 1921, when he returned, going directly to the home of his wife.

During the absence of Sam in Oregon, and in the latter part of 1920, the plaintiff in this case commenced an action against these same defendants for damages for alienating the affections of her husband, and after the return of Sam, and about March 25th, the case was settled by the defendants deeding to Bertha and Samuel jointly a quarter section of land near Java, S. D., and the payment of $500 to Mr. Skaug, attorney for plaintiff. After this settlement, Bertha and Sam began living together again. Bertha, however, refused to live with Sam after his return until the quarter section of land was deeded to him by the defendants. As a part of this settlement Sam again stated to the judge that he was the father of the child, but at all other times and places he has persistently denied that he was its father. In April they went to live at Java, first in a house known as the Flight house and then in a house owned by her grandfather. For about 3 months Sam worked at an oil station on commission, receiving only about $15 per month, but received some assistance from Sam's parents in the way of things to eat. After quitting the oil station some time in July, Sam worked for his father some and some with thrashing-machines, and also at a job of dragging roads which his father procured for him. During this summer and early fall the relations of the defendants and the plaintiff herein were apparently friendly. Plaintiff says, "they treated me kindly; they asked me into their home; never talked to me about the trial; never talked about this child that Sam said was not his."

As the winter of 1921 and 1922 approached Sam and his wife began to consider and to talk as to what they should do for the winter. She was then pregnant, 5 or 6 months along. Sam wanted to go on the farm, claiming that he could not make a living the way they were. They were having a hard time of it financially, and Sam could not find any work to do. Bertha, however, refused to attempt to live on the farm, and later, on December 26th, Bertha went or was taken to her father's home.

Whether she went willingly or unwillingly is a question. Sam then went to work at his father's during the winter, his father having received an injury which somewhat disabled him. It was during this time on November 22, 1921, that the plaintiff first finds any cause to complain of the actions and conduct of the defendants since the settlement of their difficulties on March 25, 1921. Just what happened at this time is in dispute. The plaintiff testified through an interpreter, in substance, as follows:

"Sam was through thrashing, and was home on November 20th. In the evening he went out, and was not home on the 21st. My husband came home together with his father and mother while we were living at my grandfather's house in Java on the 22d of November, 1921, on Tuesday. November 22, 1921, Sam and his father and mother came to our house, and they all came in the house. The conversation was that the parents said' that they would have Sam out to the farm, but I said that they should leave him in as I was sick. When Sam came in he said, 'Are you sick,' and I said, 'Yes, I am sick,' and then Sam said that his parents were there, and they called to take him out with them again. His father said, 'You can stay here all right if we give you $10,000 and the land on top of it,' and his father said 'This is not Sam's child,' and I said, 'They shall prove whose child this is, and they shall bring the proof here.' And the mother said, 'The whore comes not on my place.' Sam's father said, 'The land he would get rid of in some way.' I was at that time pregnant. At that time Fred Spiry or his wife said to me that my baby that was going to be born that they were not Sam's children, they were picked-up children. Sam was there present at the time this conversation took place. Sam's father said that, when they went out, where there is an ass the eagles will also be. They asked Sam to go back, and Sam said that he had to be where his parents were; in other words he said he had to do what his parents said. Sam went out of the house with his father and mother. Sam stayed out there until the following Saturday night. I was alone from the 22d until the following Sunday. I was very sick at the time. I did the work about the place, but others carried in coal and water. I went down town and got provisions for myself and the baby and had it charged to Sam, and when Sam came in he scolded that I charged those

things to him. My oldest baby was a year and 11 months at that time. The baby that I was then carrying was born on January 19, 1922. When Sam came home the next Sunday he said nothing. He scolded where I had charged those things. He was then gone until the 26th day of December, when he called me to the folks. His folks brought him to my home at different times before the 26th of December in their automobile. Fred Spiry came to get him from my home on different occasions before the 26th of December. He would usually come to get him early in the morning. He got him often. Sam took me to my parents' home on the 26th of December. A couple of days before that I had a talk with Sam. He gave me $25 and said, 'Here is $25 for the picked-up kid.' That is all he said and hauled me away. Before we had this conversation Sam said, 'I will haul you out. I don't buy no coal any more; you have to go to your folks.' He took me to my parents' home on the 26th day of December, 1921. He left immediately with my married brother and his wife. I next saw Sam on February 15, 1922. In March following I received a letter. Sam was not there when the baby was born. The baby was born at my parents' home on January 19, 1922. Sam came on February 15, 1922. That was the first time he had been to see me since December 26th previous. He stayed three or four hours on February 15th."

Some other evidence of plaintiff indicates that Sam's parents wanted him simply to go and help them on the farm as he had done at other times. At that time Sam was not doing anything. On cross-examination plaintiff testified that, when Sam came home on Saturday after November 22d, "he stayed at home until December 26th. He stayed a whole month, and his father and mother never came after him, and Sam and I did not talk about the trouble on the 22d." She also testified on cross-examination as follows:

"My brother came up on December 25th with my parents' car, and I went back to my parents in my parents' car. Sam had turned back his car to the party he had bought it from. I did not make any objections to going back to my parents on the 26th."

This is corroborated by Sam's testimony.

After December 26th, the winter became very severe with deep snow. Sam was doing chores for his father. Having heard

that a baby had been born, Sam and his brother, on February 15, 1922, with a team and cutter belonging to their father went through the snow in very cold weather to see Sam's wife and the baby at her father's home about 20 miles away. Bertha's parents were not friendly to Sam on this occasion, and Sam was made to understand that he was not a welcome guest, and he remained only a few hours and started for hime, but, because of the weather and his feet becoming frozen he was compelled to stay all night at a neighbor's about 9 miles away. Sam went back to his father's home and did not visit his wife again.

In the latter part of January or early part of February, before Sam visited his wife on the 15th of February, she had authorized the commencement of an action for divorce, which action was in fact commenced a few days after Sam returned home from his trip, and the summons in this action, dated February 17, 1922, was served on these defendants on March 8, 1922.

[1, 2] We are unable to see anything in the transaction of November 22, 1921 (assuming the evidence of plaintiff to be true, a violent assumption on considering the whole record), from which any inference could be drawn that the conduct of plaintiff's husband was in any way influenced thereby. Except on the two occasions when he stated to the presiding judge that he was the father of the first child, once in order to escape the penitentiary and again in order to settle the damage suit against his parents, he has persistently maintained that he was not the father of this first child, but on the other hand he has at all times before and after November 22d believed and claimed that the second child was his. The attitude of Sam's mind upon the legitimacy of the children and his wife's moral fidelity does not seem to have been affected by anything his parents said or did at that time, nor that his actions and conduct thereafter were any different from what reasonably might have been expected from all the circumstances, if no such incident had occurred. We must judge human beings as we find that nature has usually made them. Sam, a boy 20 years old, a German boy brought up on a farm, remaining at home with his parents, and depending on them for support, not accustomed to shift for himself, and having nothing of his own, charged and convicted of rape by the plaintiff, forced to marry her to escape the penitentiary, confronted with the problems and

responsibility of married life against his will, and having experienced the difficulties and embarrassments as well as displeasures of earning a living and providing a home for a wife he was forced to marry and a child he did not believe was his own, and being confronted with the prospect of another child in a short time, financially embarrassed and without work, and facing the situation and conditions existing in the fall of 1921 and the prospects in the future, we might well conclude that he was ready to throw up his hands and quit the job, and that there was but little, if anything, in him for any one to alienate.

But assuming, however, that there was some spark of love and affection in plaintiff's husband for her, and that he might have been of some value to her, was there any unlawful interference with their domestic relations by the defendants or either of them for which they should be held for damages in the amount assessed by the jury, viz., $9,000, or in any amount? We are unable to find any competent evidence in the record, including that hereinbefore set out, from which any inference can be drawn that the defendants or either of them unjustly and maliciously attempted to interfere with the domestic relations of the plaintiff and her husband, and outside of the occurrence of November 22d there is nothing in the conduct of the defendants toward the plaintiff and her husband from which the most fastidious could conclude that they were attempting to induce her husband to abandon her—nothing beyond the mere opportunity afforded by the relations of parent and child. This, however, should not be passed without consideration. ·It is one of the most serious things that parents have to contend with in the defense of actions of this kind. It is the writer's opinion, after 30 years' experience as a trial judge, that juries, in this class of cases, almost without exception are more inclined to hold parents responsible than strangers, simply because of their opportunity. All kinds of arguments, insinuations, surmises, deductions, and prejudices are based upon it. All the presumptions of good faith and honest motives allowed by law in favor of parents, seem to be camouflaged by this one circumstance—their opportunity. But, regardless of individual experience, there is no rule of law better settled than that persons are not to be presumed guilty of an offense, civil or criminal, because of the mere opportunity

to commit it. It is not sufficient that parents by reason of their relationship and associations with their children have the opportunity to exert an undue influence on them and have a better chance to meddle with their domestic relations · than others. There must be something more than mere opportunity or favorable conditions. A jury should not be left to guess or surmise that, because of the opportunity afforded by family relationship, and because of parental associations and interest, the parents could and might have advised or influenced a son's actions in separating from his wife, and, therefore to conclude that they probably did, and from that find it as a fact. Beisel v. Gerlach, 221 Pa. 232, 70 Atl. 721, 18 L. R. A. (N. S.) 516. To hold otherwise would be equivalent to saying that parents, because of their relationship to their children, are in a more dangerous position than strangers, especially if possessed of any wealth, to force them to sever all connections with their children as soon as married, cease all associations with them, exclude them from the family fireside, shut the door of the home, and outcast them from that time onward; and, further, it is not sufficient that there is an interference in the domestic affairs of their children by parents, but such interference must be unjustifiable and malicious, and such facts must appear in no uncertain manner. Gross v. Gross, 70 W. Va. 317, 73 S. E. 961, 39 L. R. A. (N. S.) 261. The presumption is strong that parents will act honestly and for what in their judgment is best for their children.

As said by Chancellor Kent in the much quoted case of Hutcheson v. Peck, 5 Johns. (N. Y.) 196, in speaking of the liability of parents in actions of this kind:

"Bad or unworthy motives cannot be presumed. They ought to be positively shown or necessarily deduced from the facts and circumstances detailed."

"There can be no recovery against the father unless it clearly appears that he acted maliciously, without justification, and from unworthy motives." Beisel v. Gerlach, 221 Pa. 232, 70 Atl. 721, 18 L. R. A. (N. S.) 516, and cases cited therein; Hall v. Hall, 174 Cal. 718-727, 164 Pac. 390.

The record in this case does not disclose any evidence which approaches the establishment of these facts according to the standard fixed by law.

Respondent, as the principal basis for inferring malice on the part of defendants, assumes that they honestly believed that their son had been imposed upon, falsely accused, and unjustly convicted of rape and forced to marry plaintiff in order to escape the penalty and had spent considerable money in his defense. If this be admitted, then their beliefs were to them as substantial and serious as if such facts were actually true, and all the instincts of parental sentiment would prompt them to feel that to be compelled against his will to assume the relations and obilgations of husband to a woman who had been defiled by some other man, and father to a child who was not his own, was a perpetual injustice and imposition on him, and a continued humiliation, and disgrace from which he should be relieved. While it might have engendered a feeling of dislike and disrespect for plaintiff, yet, when we consider the natural impulses which usually govern the attitude of parents in regard to the affairs of their children, we cannot but conclude that the paramount thought in the minds of the defendants would be the welfare and happiness of their son, and that the predominant motive in whatever they did, if anything, would be an honest desire to relieve him of this embarrassing situation, which no doubt looked gloomy to them; and under the undisputed rules of law would not be responsible for consequences. No matter how unfounded their beliefs may be, nor how false the information on which they were based, or how deluded by confidence in the integrity of their son, if the defendants acted honestly they cannot be held liable (assuming without conceding that they took any such actions). Jones v. Monsons, 137 Wis. 478, 119 N. W. 179, 129 Am. St. Rep. 1082; Oakman v. Belden, 94 Me. 280, 47 Atl. 553, 80 Am. St. Rep. 396; Gernerd v. Gernerd, 185 Pa. 233, 39 Atl. 884, 40 L. R. A. 549, 64 Am. St. Rep. 646; Brown v. Brown, 124 N. C. 19, 32 S. E. 320, 70 Am. St. Rep. 574.

Beyond what has already been referred to in this opinion there is not enough in the record to call for a further discussion of the law governing the rights, privileges, and liabilities of parents in relation to the domestic affairs of their married children.

The verdict of the jury which apparently is a mulcting of the defendants for the supposed sins and iniquities of their son should not be allowed to stand.

[3]   Upon redirect examination of plaintiff she was asked the following question by her counsel: "What did Sam say, if anything, to you about why he didn't live with you?" To which defendant objected on the ground it was incompetent, indefinite as to time and place, not binding on the defendants, calling for a conclusion and hearsay which objection was overruled, and the witness answered. "He stated that he didn't dare to."

The trial court permitted this question to be answered apparently upon the theory that it had been rendered admissible by the cross-examination of plaintiff, and that it only went to show the relations of the plaintiff and her husband.

While the question might have been answered in a way which could not have affected the defendants, the purport of the question was to elicit an answer that would tend to fix the responsibility for Sam's conduct upon the defendants, and, while the answer does not directly fix the cause of his not living with his wife upon the defendants yet in the light of the circumstances it could hardly be construed by the jury in any other way than as attributing the cause to his parents.

While there was considerable cross-examination of plaintiff as to the relations of herself and husband, and while the rules are quite liberal in allowing great latitude in inquiring into relations of the parties in this class of cases, it is hard to conceive how this question and the answer which it was intended to elicit and did elicit could bear upon the relations of the plaintiff and her husband; it did not seek to show nor did the answer show any relations between them. It sought to show a cause for such relations, a cause for Sam's attitude, and sought to show that defendants were the source of that cause. This was one of the questions and perhaps the principal question in this case for the jury to decide, and it was an invasion of the province of the jury. It was also hearsay as to the defendants. McGowan v. Armour, 248 Fed. 676, 160 C. C. A. 567; Gilmore v. Gilmore, 42 S. D. 236, 173 N. W. 865; Cochran v. Cochran et al., 196 N. Y. 86, 89 N. E. 470, 24 L. R. A. (N. S.) 160, 17 Ann. Cas. 782; Luick v. Arends, 21 N. D. 614, 132 N. W. 353; Brison v. McKellop, 41 Okl. 374, 138 Pac. 154.

It subsequently developed that this statement was made prior to March 25, 1921, the date of the settlement of the pre-

vious case, and for that reason was immaterial as a matter of. law, and should have been excluded, had that fact appeared to the court at the time of his ruling. However, it does not follow that because it was immaterial as a matter of law that it was immaterial as a matter of fact. Jurors, as a rule, are not so discriminating in this class of cases as to eliminate the general effect which such a question and answer would have on them in holding the defendants generally liable for the husband's conduct at all times, and was probably prejudicial to defendants. It is a difficult thing to ring a bell and not disturb the atmosphere, or to cast a stone in the water without causing riffles. McGowan v. Armour, supra.

[4] So far as the application for a new trial is based on newly-discovered evidence, I do not think this, standing alone, is sufficient to authorize the granting of a new trial. When the plaintiff testified at the very beginning of the trial to the transaction at her grandfather's house on November 22d, the defendant had notice thereof, and, if such testimony was not true, and the defendants were in fact not there, it would have been most natural and probable that the defendants would have informed their counsel of that fact, or that counsel would have inquired about the circumstances of their being there, which would no doubt have led to an inquiry of their whereabouts on that evening, and learn of these witnesses in time to have procured their attendance or made application for continuance in order to procure them. While the defendants may not have been able at the time to have recalled or remembered where they were on November 22d, or who was at their place on that evening, there is no showing that they were unable to do so. We do not regard it as good practice to encourage the granting of new trials upon every piece of evidence that may be dug up after the trial which might, with a high degree of diligence, have been discovered before or at the trial.

The judgment and order appealed from are reversed.

BURCH, Circuit Judge. I concur in the result, but prefer to assign as the sole reason for reversal the insufficiency of the evidence to support the verdict.

Note.—Reported in 199 N. W. 778. See, Headnote (1), American Key-Numbered Digest, Husband and wife, Key-No. 333(9), 30 C.

J. Sec. 1020; (2) Husband and wife, Key-Nos. 325, 339(9), 30 C. J.
Secs. 1020, 996; (3) Appeal and error, Key-No. 1050(1), 4 C. J.
Sec. 2953, Evidence, Key-No. 314(2), 22 C. J. Sec. 167; (4) New
trial, Key-No. 102(1), 29 .Cyc. 886.

On liability of parent for causing separation of husband and
wife, see notes in 9 L. R. A. (N. S.) 322; 46 L. R. A. (N. S.) 467.