ELVA BUSENBARK, Appellant, v. JAMES and ORA BUSENBARK, Appellees.

**Husband and wife:** ALIENATION OF AFFECTION: EVIDENCE. Parents are at liberty to exercise great solicitude for the welfare of their children, even after marriage, and may advise freely, frequently and even foolishly; and the good faith of their advice will be presumed until the contrary is made to appear.

In this action by a wife against her husband's parents for the alienation of the husband's affection, the evidence is reviewed and held insufficient to show malice or concerted action on their part to alienate the husband's affection, but that defendants were within their rights in advising plaintiff and her husband, although in some instances they acted indiscreetly.

*Appeal from Linn District Court.*—Hon. MILO P. SMITH, Judge.

TUESDAY, JANUARY 10, 1911.

ACTION for damages for alienating affections. At the close of the plaintiff's evidence there was a directed verdict for the defendants. Plaintiff appeals.—*Affirmed.*

*J. H. Preston* and *Rickel & Dennis,* for appellant.

*Voris & Haas,* for appellees.

EVANS, J.—The defendants are husband and wife, and are the parents of Merle Busenbark, who is the husband of the plaintiff. The plaintiff and her husband were married in Linn County on December 19, 1906. They were each about twenty-one years of age, and were without financial resources. Prior to the marriage the plaintiff taught school and made her home with her parents near Marion. Merle lived with his parents on a farm about nine miles from Marion. After the marriage, the young couple made their home for the winter with the defendants. In the meantime with the help of the defendants, a farm was rented about eleven miles distant, known as the "Woodward Place," and they entered into occupancy of such farm about the last day of February. James Busenbark appears to have furnished the means with which to purchase the necessary personal property used on the place, including stock, and to have taken a bill of sale thereof

from his son to himself.   The young couple seem to have lived together in mutual affection until August or September, 1907.   They finally separated about September 22, 1907.   The only difference or controversy between the plaintiff and her husband which is made to appear from plaintiff's evidence was that he wanted to get a place for the succeeding year in the neighborhood of his parents. The evidence also tends to show that this was in accord with the wish of the parents, and that they offered assistance in the matter of getting such place.   Several small places were discussed with a view to buying the same. The supposed advantage to the husband involved in such a plan seems to have been that he could thereby get the assistance of his parents in acquiring a place near by, and he could rent a part of the home farm and could have the use of his father's farm implements.   The plaintiff objected to occupying any place near her husband's parents. Before the final separation, she did agree to "compromise" on one place known as the "Stringer Place," "if he would agree to protect me from his parents' abuse, but he wouldn't do that."   This compromise was also conditioned upon the willingness of the defendants to purchase the Stringer place. Whether the defendants were willing or unwilling to do this does not appear from the record.   The culmination of their differences was a separation a few days later.   We avoid all discussion of the merits of the controversy between plaintiff and her husband, lest we throw something in the way of future reconciliation, or prejudge matters which may come up for judicial consideration later.

The claim in this case is that the affections of plaintiff's husband were alienated from her by the defendants in pursuance of a conspiracy on their part to that effect. It is averred that to carry out such conspiracy "they adopted a systematic scheme of finding fault at all the acts of the plaintiff" and that in this way; and by means "of promises and presents made to the said husband," they

completely destroyed her husband's love and affections for her. The record is barren of any evidence of a conspiracy. It is left to us therefore only to inquire whether there is sufficient evidence against either defendant to entitle the plaintiff to a submission of the case to the jury as against such defendant. The larger quantum of the evidence is directed against the mother-in-law, and we will give our first attention to that.

The first incident related occurred about a week after the young couple had gone into the home of the defendants. They did their washing one day, and the young husband offered "to hang the clothes upon the line." When his mother saw him engaged in this work she "scolded" the plaintiff in this wise: "She said that I should be out helping him; that he never had hung up clothes before, and he didn't know how to do it, and he wouldn't get it done right, and that I should help him." A couple of weeks later "it was wash day again" and was a very cold day. The usual facilities for washing in the family were that the washing machine was attached to an engine in the engine shed just outside the kitchen. The washing machine was used in this shed where there was no fire, and the heating of the water and the boiling of the clothes was done in the kitchen. On this particular day, the plaintiff's husband detached the washing machine from the engine and brought it into the kitchen and they did the washing in the kitchen, and "his mother scolded him because he did." Then when his father came in his mother said, "Merle wouldn't mind me," and his father said if he "couldn't do as his mother said, he should get out of there." "She said that she didn't want it in the house, that it was warm enough; that she washed out there, and that it wouldn't hurt me; that it steamed up the house, and spoiled the furniture." This language is the only interference complained of at this point. The washing was done in the house notwithstanding the objection.

The next incident complained of occurred on the last day of February when the plaintiff and her husband moved to the Woodward place. The wagons were being loaded up under the direction of the mother-in-law. She seems to have taken it for granted that the plaintiff would ride on one of the wagons to the Woodward place. The plaintiff did not feel able to do this, and the following colloquy occurred. "I asked her how I was to go and she said she didn't know; that I would have to go on one of the loads; that she didn't know how else." "She said that if she was well enough she could drive one of the teams on a load herself. She said if I didn't do that my father would have to come after me." "She wanted me to drive a team on a load when we moved, and I said it was too cold and too far. She said I might have my father come after me, and I did have him come."

In the course of the spring and summer the defendants visited the plaintiff and her husband at the Woodward farm a few times. The conduct of the mother-in-law on these occasions, is set forth by the plaintiff in her testimony as follows: "Every time she came she found fault with the way I was doing my work or something that I was not taking care of, or that I shouldn't use a tablecloth every day. Said she ate off an oil cloth, and that I shouldn't use the silverware every day; that it would spoil it; and wanted to know if I had polished my silverware; and that she would meddle about making my butter, that I didn't know how to make butter; said that I wasn't letting my milk stand long enough to, get all the cream." This is amplified in her later testimony as follows: "From the time that we went there until the time that we moved she was always asking how much money I had, how much I had laid up, how much my parents had, and telling me I ought to have different articles, and that I should furnish them myself. She was speaking of buying me a tub to wash with. We told her she didn't need to do

that, that I would go home and wash with my mother until I could get a washing machine of my own. She was complaining because they had to buy so many things for us to go to housekeeping with. She said, well her mother and her sister used a washboard, and it wouldn't hurt me to do that. I hadn't complained of anything. of the kind, just told her that she needn't buy me one; that I could go home and wash with my mother until we got a machine. From time to time she would tell me I put too much sugar in; that that cost money, and that I would make it too rich; that it cost money; that cream would make things too rich; that cream was expensive and she couldn't afford it." And again: "On that occasion after my husband and his father had gone out of doors, she picked up one of my knives and forks and says, 'Did you polish your silverware?' and I said, 'No; I hadn't had time,' and she said, 'Well, didn't I give you some polish?' I had taken a pan that she had given me, and she noticed that it had been put on the stove a time or two, and she said, 'You oughtn't to do that unless you put an asbestos pad under it; you will spoil it.' At that time I don't remember anything particular that the defendant James Busenbark said."

The last incident complained of occurred at threshing time when the mother-in-law went to the Woodward place to assist the plaintiff in the cooking. The plaintiff testified: "I had my dinner planned before she came there and knew what I was going to have for dinner, and among other things I was going to have blackberries raw, and she said I should cook them; that it would take too much sugar to sweeten them; that it wouldn't take so much sugar if I cooked them. I was going to have cucumbers, and she didn't think the men would like them—she said Jim didn't like them; and I was going to have tapioca pudding, and she said I oughtn't to have that because her husband didn't like it. I asked her to cook the meat,

but my sister had to cook it; she wouldn't cook it. She didn't think it would taste good because it was not cooked right. She didn't taste it because it wasn't cooked right, she claimed."

The foregoing comprises all the testimony in the record which pretends to set forth any specific wrongful conduct on the part of the mother-in-law. The testimony of plaintiff abounds in such expressions as, "She was continually nagging me." She testified also that her husband cried all night after the washing machine incident, and that he told her at different times that his mother was a "mischief maker" and "couldn't get along with any one." He also praised her cooking notwithstanding his mother's criticisms. The incidents which are described as above set forth in plaintiff's testimony appear to us as very commonplace. They may have been unwise and lacking in delicacy and tenderness, but there is nothing to indicate that they were otherwise than the natural expressions of solicitude of this mother-in-law. Parents often annoy their children with advice, good and bad. The good is often quite as annoying as the bad. This mother-in-law seems to have fought the battle of thrift in a certain way, and she was quite sure that it was the only safe way. The plaintiff was manifestly cast in a gentler mold, and was perhaps nervous and sensitive. Such expressions as "she was always nagging me" may be quite as descriptive of her own sensibilities as of any wrongful conduct on the part of her mother-in-law. This is especially so in view of the meager showing of specific conduct in this case. It may be that the mother-in-law was too severe in her expectations and in her advice, and that in her search for signs of thrift and promise of success, she was too easily disappointed. But we see nothing in this testimony from which a jury could say that she was acting in bad faith, or that she was doing these things with a malicious purpose to accomplish the separation of the young pair. If we

grant that she was blameworthy in it all, that of itself is not enough to give rise to this cause of action. The law is tender of the parental relationship. The parent has the liberty of extreme solicitude for the welfare of the child even after marriage, and may advise freely and frequently and even foolishly. His good faith will be presumed until the contrary is made to appear. *Corrick v. Dunham,* 147 Iowa, 320; *Heisler v. Heisler* (Iowa), 127 N. W. 823, and authorities cited therein.

The plea of the mother-in-law for economic methods was in no sense inconsistent with her good faith even though unduly severe. We see nothing in this record which could give rise to any inference of malice as distinguished from a mere lack of judgment or lack of appreciation of the difference between plaintiff and herself as to temperament and taste and education. It was perhaps indelicate to ask the plaintiff how much money she had and how much her parents had, but it was not malicious. All the evidence tends to support the legal presumption in her favor, and tends to show that she really wanted to know. A discreeter person perhaps would have found out in a more indirect way. A new family had been organized, and the means and method of subsistence were a very important consideration whether expressed or not. The problem of the household is multifarious in its details. "Cream and sugar" *are* expensive; "silverware" *must* be polished; the "asbestos pad" has its important function; and the "tablecloth" *has* its perplexities. Is there any mother of grown-up boys and girls in moderate means who has not laid parental injunction at all these points? Nor are we able to see in this testimony anything that would justify a finding that the mother's mistakes, if any, caused the separation. Most of the incidents testified to occurred in the son's absence.

It is urged upon our attention that at one time the parents promised to get him an automobile and that he was

thereby won away from his wife. The testimony of the plaintiff on this subject is that some time in April the mother said, in the "presence of the father: 'If you will come down here next year we will get you an automobile.' " This was long before there was any trouble between the parties. We see nothing in such a statement inconsistent with the continuance of the marriage relation. It was entirely consistent with the expressed desire of the parents that they should live in their neighborhood as before indicated, and was only one of the various inducements offered to that end. It is our conclusion that the trial court properly directed the verdict in favor of this defendant.

II.   Turning, now, to the evidence relating to the defendant James Busenbark, it is even more meager than that against his wife. The only incident shown against the father-in-law prior to the date of the final separation is that concerning the washing machine to which reference has already been made, when he said to Merle that "if he couldn't do as his mother said, he should get out of there." The other incident upon which the liability of this defendant is predicated occurred on the morning of the 23d of September when the household goods were divided between the parties. For two or three days prior to this date, the plaintiff had remained at the home of her parents, and her husband had remained at the home of his parents. They had separated subject to the possible compromise on the Stringer place. On that morning the father accompanied Merle to the Woodward place. After they arrived there the plaintiff with her father arrived. Her testimony is that at that time she said to her husband: "Isn't there something we can do to not break up our home ? If I get down on my knees, would it do any good?' He said: 'It's too late; I have done all I can. It would be a disgrace not to put the sale bills up now.' " She also testified as follows: "My father was with me and he asked Mr. Busenbark, the defendant, what was the

trouble, what fault he had to find.  He said I was lazy,
and wouldn't mind his wife, and that I wanted such a
nice house and hardwood floors.  I had never asked for
any of the sort.  He said that I wouldn't work out of
doors; that his wife had worked out of doors, and that I
wouldn't work out of doors enough to suit them.  I had
worked out of doors, but it didn't suit him.  My father
said to him, 'She can make you trouble for this,' and he
said, 'Crack your whip,' he also said he was ready to back
Merle in anything he undertook."  Plaintiff's father tes-
tified in her behalf concerning this incident as follows:
"When we got there the first thing we noticed was a team
hitched to the wagon—Merle's team.  I drove up to the
door, and my daughter got out and went in.  She was
gone a short time and came out, and said Merle and his
father were there.  I got out, went in, and found the
defendant James Busenbark and Merle Busenbark there.
They were standing there getting ready to post bills as
I understood it, and the team was tied out by the hitching
post waiting for them.  I don't know what they had been
doing.  I spoke friendly to them.  I was surprised.  I
asked him what it meant, and he said he didn't know;
that Merle was going to make a sale.  He said Elva
wouldn't move on the Sandefur place with him, and he
was going to make a sale of the stuff and divide up.  He
said he was there to stand by him in anything he did.  I
said to him, 'Mrs. Busenbark can make you trouble for
this.'  He said, 'Crack your whip.'  I asked him what
fault he found with Elva, and he said she was lazy, and
didn't know anything more than a twelve-year-old girl;
that she wouldn't mind his wife, and wouldn't try to learn
anything from her; wouldn't listen to her—he said they
had to do all the helping; that she wouldn't work out of
doors enough.  He said his wife with two little children
went out and helped him husk corn time and time again.
.  .  .  When he said they had to do all the helping, I

said, 'Don't you think that you helped them a little too much, giving them so many hogs that they didn't have room for them?' and he·answered they wouldn't have given them so much if it hadn't been to keep Merle from working on the railroad. . . . He and his father decided they would divide the things that day. I don't recall the words that led to it. . They said something about her taking her things, and she said she didn't have anything but the buggy to take them in, and couldn't take them then; that is the way she came to call for a key so she could come back and get them. Mr. James Busenbark said they might just as well divide them up that day as any other; so they waited and postponed posting the bills, and divided the things in the house. I think they divided the wedding presents, and he took her things and she took his. The old gentleman, Busenbark, said that my daughter should have been watching when her husband passed the house, and that if she had any interest in the home she would have been over there and had supper ready for them."

Some of this was harsh judgment, but its expression was not volunteered, nor can it be said upon this record that it had anything to do with causing the alienation of affection complained of. The same witness testified concerning Merle's conduct on the same occasion as follows: "I heard Elva, my daughter, begging him not to dismantle the home, not to break up and divide things, and he said that it was too late; that the sale bills were advertised; and that it would be a disgrace to disappoint the people now; that they would laugh at him. This is what my daughter's husband said. She also said at the same time that she would go anywhere with him, even down there near his folks if he would stand by her. To this he wouldn't make any reply."

The burden was upon the plaintiff to show more than mere wrongdoing on the part of the defendants. It was

incumbent upon her to show that they caused the separation or the loss of affection. It is urged in argument that the defendant James Busenbark assisted in dismantling the home, and that that fact rendered him liable. This is not the ground upon which liability is predicated in the petition. And if he were a wrongdoer in that respect, it would not render him liable in this action unless it was the cause of the loss to plaintiff of her husband's affections. It is our conclusion that the verdict was properly directed as to this defendant also.

The order of the trial court is therefore *affirmed*.