ERMA WILLIAMSON, APPELLEE, V. EMMA WILLIAMSON ET AL., APPELLANTS.

FILED JULY 1, 1930. No. 27167.

*Good, Richardson & Good* and *E. S. Schiefelbein,* for appellants.

*Roy B. Ford* and *W. B. Comstock, contra.*

Heard before Goss, C. J., Rose, Dean, Thompson, Eberly and Day, JJ., and Lightner, District Judge.

Lightner, District Judge.

This is a suit by Mrs. Erma Williamson, wife of Alva Williamson, against his parents for alienating his affections. The jury found in plaintiff's favor in the sum of $7,500 and the defendants bring the case to this court on appeal.

Defendants present two main grounds for reversal: First, that the district court erred in striking from their answers their pleas to the jurisdiction; and, second, that the evidence is not sufficient to sustain the verdict.

Defendants separately plead that they were induced to come into Lancaster county by the fraud and trickery of the plaintiff who there secured service of summons upon them. However, the defendants did not raise this question when they were first called upon to answer, but they each filed a motion asking that the petition be made more definite and to strike. It is a well-established rule in Nebraska that by filing such motion the defendants submitted themselves to the jurisdiction of the court and waived any irregularity or defect in obtaining jurisdiction over them. *Bankers Life Ins. Co. v. Robbins,* 59 Neb. 170, and *Lillie v. Modern Woodmen of America,* 89 Neb. 1. This rule is in conformity with good judgment, for naturally it would be useless for the court in Lancaster county to spend its time examining the petition persuant to defendants' motion if the court did not have jurisdiction over the persons of the defendants. To the same effect see *Linton v. Heye,* 69 Neb. 450; *Hurlburt v. Palmer,* 39 Neb. 158; *Kyd v. Exchange Bank of Cortland,* 56 Neb. 557; *Baker v. Union Stock Yards Nat. Bank,* 63 Neb. 801; and *Gaines v. Warrick,* 113 Neb. 235. Defendants insist that our court has held that the filing of a preliminary motion or demurrer does not waive the objection, and there

appears to be some support for this contention in the case of *Kyd v. Exchange Bank of Cortland, supra.* In that case the defendant filed a demurrer based evidently on the want of jurisdiction which must have appeared on the face of the petition. The court sustained the demurrer. Later the plaintiff amended his petition and the defendant then successfully raised the question of jurisdiction in his answer. That the case above referred to does not rule the instant case will appear from the syllabus wherein it is said that, if the defect be one of jurisdiction of the person, it is not waived by demurring to the original petition generally, if such demurrer is sustained for the reason stated in the order, that the court is without jurisdiction, and where the plaintiff waives any error in that order by amending his petition.

We will next examine defendants' claim that the evidence is insufficient to support the verdict. Defendants claim that the evidence does not show that they alienated their son's affections from plaintiff, or if their acts and advice could by any construction be held to have produced that result that nevertheless they were not actuated by malice but by good motives in all that they did and said. The writer has carefully read the pleadings and read and abstracted the bill of exceptions consisting of over 280 pages and believes that the record is entirely deficient in proof to support a verdict for the plaintiff.

The facts in this case are substantially as follows: The plaintiff and Alva Williamson, son of the defendants, were married at the plaintiff's home in Lennox, Iowa, on July 4, 1927. Plaintiff was then 20 years old and Alva was 21. Alva's parents lived in Lincoln at that time and both plaintiff and Alva were attending the Lincoln School of Commerce. The young couple first met in 1926. Alva brought plaintiff to his home and introduced her to his family in February, 1927, and about two weeks before the marriage she came to live with the defendants, and on July 5, after returning from the marriage, she continued to live with them until about August 1, 1927, when the young couple moved to Stapleton, Nebraska, where Alva was employed

in a lumber yard. He lost his position about December 1, 1927, and on invitation from the defendants the young couple again made their home with the defendants, except for visits, and part of the time Alva was employed at a distance. Plaintiff, however, continued to live with them until about May, 1928, when she finally left, or, as she claims, was forced to leave, since which time she has been living in Lincoln. The defendants moved from Lincoln to Ithaca about March 1, 1928, and the plaintiff accompanied them. There was no quarreling between plaintiff and defendants, no open hostility of any kind, and so far as the record shows the defendants were not aware of the fact that anything they ever said injured the feelings of the plaintiff, but the plaintiff says that on several occasions the defendant father-in-law made remarks which deeply wounded her feelings. She claims that on one occasion when her husband was working at Palmer and she was looking for a letter from him and asked her father-in-law if one had come, he said: "No. He has probably got another girl out at Palmer anyway. He isn't so foolish as he used to be. When I was first married I used to be foolish too, but I got over that." And at another time while her husband was in Wood River her father-in-law said: "He isn't foolish any more like he used to be." The defendant Elmer Williamson denies making these statements. If he made them they undoubtedly show a lack of delicacy on his part, but plaintiff says herself that she did not cry or show her feelings before her parents-in-law and there is nothing in these statements made in the absence of the husband, and in so far as the record shows not communicated to him, which would have any tendency to alienate his affections.

Plaintiff accuses the defendants of advising a separation without legal justification. Alva testified that once in April, 1928, when his father was wanting him to move out on his farm the following spring, he said: " 'If there is any trouble between you'—now, he didn't know that there was and I didn't tell him that there was. * * * 'If you are going to separate, the quicker you quit, the better. There is no children to suffer by the separation now, and if that is

what it is coming to, the quicker the better.' " The evidence however shows conclusively that there had been trouble between the young couple prior to this time. The father-in-law's version of the matter is that on the day in question, April 27, 1928, he had a talk with his son about going out on his farm, and the son told him that he and his wife had been wrangling all the way from Palmer home and said: "I am leaving here, * * * I flatly refuse to live with her." And then the father said, "If that is the way you feel about it, don't bring any children in this world that have to suffer along with the rest of us," and that was the only time he ever said anything about separation. This conversation, as related by the son, has a tendency to support plaintiff's contentions, but even the son's account indicates that the father believed that they were having trouble, a fact that could scarcely escape his notice since they were all living under the same roof, and the advice given under such belief cannot be said to have been malicious.

Plaintiff complains that defendants by their advice prevented the young couple from going to California where Alva could obtain work, but the record is clear that no job in California had actually been offered to him. The question of going to California came up in the winter on receipt by plaintiff of a letter from a relative, a demonstrator for aluminum ware, suggesting that the young husband might find work there, but not actually offering him a job. They had $75 or $100 and intended to make the trip by automobile. Mr. Williamson, Sr., simply intimated that it would be unwise to undertake the trip at that time of the year with so little money and no job assured. Plaintiff also complains that the mother-in-law prevented Alva from taking a job in an apartment house in Lincoln, and claims her mother-in-law said in effect that such a job was below his education and station in life, but the record shows quite conclusively that he was the second applicant for the job and intended to take it, but when he came back to further see about it, it had already been given to the first applicant.

Plaintiff refers to various acts of keeping her and her husband apart. She says her mother-in-law and husband

went to a funeral without inviting her to go with them, but the record shows that she was not acquainted with the deceased and did not expect to live in that neighborhood. Defendants claim that she was offered the opportunity to go and declined. In any event this instance adds nothing to plaintiff's claim that the affections of her husband were alienated. Some of the other occasions complained of were when the young husband took his mother to Ceresco to see her mother who was and for some time had been bedfast. It was a simple act of filial duty for the son to take his mother on these trips. There is no proof that the mother said anything to the son on these trips to influence him against his wife and the trips, so far as the record shows, were not for the pleasure of the son nor for the purpose of being away from his wife, but pursuant to a well-understood duty. She complains because on one occasion the son went to a wedding anniversary party without inviting her to accompany him. This was a few days before March 1, 1928, and while the Williamsons were preparing a house in Ithaca for occupancy. The mother and son usually went up during the day and returned at night. There was some talk between plaintiff and her husband about going to this party. Before leaving for Ithaca that morning the son told his wife that he had decided not to go, but later he decided to go and plaintiff was left home alone. There is no proof that the mother influenced him to go. Plaintiff also complains because she was left in Lincoln and not taken to Ithaca to help with this work. The record does not show any sinister purpose in leaving her in Lincoln, but shows that she was left there to take care of a young son of the Williamsons, a child six years of age, who otherwise would have been left alone for several hours. There is nothing in any of these incidents to indicate an intention on the part of the parents to separate the young couple. She says that defendants gave plaintiff to understand that their son was foolish in getting married and would never get anywhere with a wife on his hands. Such remarks, if made, in light of the whole record, were nothing more than criticism on the young couple for having married so young.

One of her principal complaints is that defendant, Mrs. Williamson, Sr., at one time, apparently early in April, 1928, interrupted intercourse between the young couple in such manner that it was never reestablished. · Even if the disastrous consequences claimed by plaintiff followed from the alleged interruption, the record is quite clear that it was accidental and unintentional. If more than one act had been complained of, some design of the mother-in-law might be deduced, but for the mother-in-law to step into the bedroom occupied by the young couple early in the evening would not be so unusual. Besides, they could have locked or barred their bedroom door, and it would seem that the love of the husband had already become tenuous in the extreme if this one accidental interruption by his mother resulted in the entire cessation of the marital relation between the young couple. Furthermore, both the mother-in-law and the son say that the mother-in-law knocked on the door and was given permission to enter before entering. Plaintiff says that during the last meal she ate at defendants' home the family refused to pass her things at the table and refused to talk to her. If this happened, which is denied, it was long after plaintiff herself claims that her husband's affections were completely alienated.

Acting coolly toward the plaintiff and hardly talking to her in the presence of her guests: Plaintiff simply testified to the conclusion that on Easter Sunday when she had some guests her mother-in-law treated her coolly or coldly. We are left in the dark as to exactly what she did. On this particular Sunday Mr. Williamson, Sr., and daughter Vera were both sick. Nevertheless, the mother-in-law was willing to have in the outside guests. There is nothing substantial in this contention to support a verdict.

Speaking contemptuously of her in the presence of her husband in making reference to what a Williamson woman would do under the same circumstances: This remark was used in discussing plaintiff's wish to work in an office and was to the effect that the place for a Williamson woman was in the home, and that a woman couldn't work seven or eight or nine hours a day in an office and also do the house-

work. The record does not show that plaintiff was referred to contemptuously, but she was asked to occupy the status of a Williamson woman. This would indicate, not a wish to separate plaintiff from her husband, but to make her an integral part of the Williamson family. While plaintiff may be right in her contention that this advice prevented her from obtaining a job so that a separate home could be maintained and had a tendency to bring about the loss of her husband's affections, its purpose and design appear to have been just the opposite.

She complains that defendants went to Wood River immediately after receipt of her letter saying she was going to Wood River, and did something there which dissipated any affection that their son bore for the plaintiff. There is no evidence to indicate what conversation the defendants had with their son when they visited him at Wood River. Plaintiff testified that she received a letter from Alva after such trip stating that his parents had talked it over with him and that he was through with her; that he didn't know if he would ever come to see her again and for her not to dare to come out to see him. Such evidence is hearsay as to defendants. Shortly before defendants visited their son at Wood River plaintiff also visited him there, and on her return wrote to her mother-in-law stating that she had had a nice time with her husband on the trip, and said further: "Dear Mother: * * * I surely do miss you folks. * * * Whenever you come to Lincoln be sure and come in to see where I work. I surely would be glad to hear from you. As ever, Erma." Plaintiff testified that once, when Alva was leaving, his mother said: "It is just impossible for me to give my son up." Mrs. Williamson, Sr., denies making the remark. At most, it was only an expression of her attachment for her son.

The above states substantially the complaints of plaintiff, although other incidents of a similar nature are related by her, none of which however would have the effect of alienating the husband's affections or were designed for that purpose. The record as a whole shows that the defendants had a liking for plaintiff and she for them; that they never

intentionally interferred in their marital relation, but did give advice and offer suggestions in regard to their business affairs. Plaintiff testified to a number of remarks made by her husband to her in the absence of defendants, such as that his parents had not wanted him to get married and now they would have to make good; that his father told him he didn't want them to have children right away, and so forth. Defendants denied giving such advice to the son, and such statements are admissible, not to show the facts, but only to show the state of mind of the husband, to show a cooling of his love through the influence of defendants.

There is no doubt that the young husband's love for his wife waned and it was perhaps natural for plaintiff to lay the blame on her parents-in-law. It is not the first time in which apparently warm and enduring affection scarcely outlived the honeymoon. It is scarcely possible from the record to surmise the real reason for the coldness that grew up between this young husband and wife and lead thus early to the tragedy of a separation between them. Defendants hint that the real trouble was that plaintiff wanted to live in a big city and was not willing to undergo the drab and colorless existence of life in a small town where the duties of her husband would take her. Part of the trouble of course between the young couple must be ascribed to the fact that the financial condition of the husband was such that they had to make their home with his parents. It was an unsatisfactory arrangement, but the defendants were not to blame. They did the best possible under the circumstances and offered their home as an asylum where the young couple could come in from their misfortunes and find a home and rest.

The authorities, we believe, fully sustain these conclusions. In the cases of *Hope v. Twarling,* 111 Neb. 793, and *Stocker v. Stocker,* 112 Neb. 565, are statements of facts held by the court to justify a recovery by plaintiff. While it is not intimated in the opinions that facts less strong might not justify and support a recovery, it must be admitted that the facts in these two cases were very much stronger than in the present case.

"The law presumes that the father and mother, in advising their minor child, acted in good faith and for what they supposed his best interest." *Melcher v. Melcher*, 102 Neb. 790.

"There is a well-defined distinction between the privileges accorded to parents and guardians in their communications with children and wards, with reference to their domestic relations, and that which exists between strangers.

"Where advice is given by a guardian, which leads to a separation by the ward from husband or wife, the presumption is that the advice was given in good faith." *Trumbull v. Trumbull*, 71 Neb. 186.

On the other hand, "if a parent breaks up, or assists in breaking up, a valid marriage, * * * solely 'because he is displeased with the marriage, or because it is against his will, or because he wishes the marriage relation to continue no longer,' he will be liable in damages to the party injured." *Melcher v. Melcher, supra.*

In an alienation suit by the wife against the husband's parents, the existence of malice must be affirmatively proved, for a parent who advises his son or daughter to leave the marital home is presumed to have done so out of parental affection and solicitude for the welfare of the child, and he cannot be held liable unless the plaintiff, who has the burden of proof, establishes that his advice or conduct is actuated by malicious motives. *Sowle v. Sowle*, 115 Neb. 795. It is true that it is said in the opinion in *Melcher v. Melcher, supra*: "It is unlawful to attempt to separate husband and wife, or to annul or dissolve the marriage relation between them, unless some statutory ground for annulment or divorce exists. If such ground exists, or the circumstances are such as would lead a reasonable mind to believe that it does exist, the parent who, in good faith, believes that the ground exists, may advise as he honestly believes is in the interest of his son." The part of the syllabus with reference to this point is not so broad; the fourth paragraph of the syllabus in *Melcher v. Melcher* being: "A parent may advise his son in good faith to leave

his wife or to procure a divorce, if statutory grounds for separation and divorce exist or he has reasonable cause to believe and does believe that such grounds exist." Both the quotations from the opinion and the syllabus must be considered, however, with reference to the facts in that case, which were that the son's parents, for some reasons of their own, because of religious differences, or differences in financial conditions, or matters of education, determined that the marriage should be annulled without regard to the feelings of the parties most concerned and without regard as to whether legal grounds for separation did or did not exist. We think the most that can be said for appellee's contentions that malice may be presumed in this case is that, if the husband's or wife's parents are instrumental in breaking up a marriage under such circumstances as are set forth in *Melcher v. Melcher,* and where no legal grounds for separation exist or the circumstances are not such as would lead a reasonable mind to believe that they do exist, the jury may infer or presume malice from such acts on the part of the parents. The burden would still be on the plaintiff to show malice, but the jury would be authorized to infer it from such wanton and unjustifiable conduct. But no wanton or unjustifiable conduct sufficient to alienate the son's affections have been shown in this case.

In *Beisel v. Gerlach,* 221 Pa. St. 232, 18 L. R. A. n. s. 516, the Pennsylvania court say: "The law recognizes the right of a father to advise his daughter about her domestic affairs without incurring liability for alienation, if the advice be given in good faith and prompted by worthy motives, even if such advice influenced the daughter in making up her mind to separate from her husband. In other words, there can be no recovery against the father unless it clearly appears that he acted maliciously, without justification, and from unworthy motives." In *Busenbark v. Busenbark,* 150 Ia. 7, the court say: "The law is tender of the parental relationship. The parent has the liberty of extreme solicitude for the welfare of the child even after marriage, and may advise freely and frequently and even foolishly. His good faith will be presumed until the contrary is made

to appear." See, also, *Larsen v. Larsen,* 115 Neb. 601, and *Sohl v. Sohl,* 114 Neb. 353.

For the reason that the evidence is insufficient to support the verdict, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

ROSE and DAY, JJ., dissent.