Verna Wallrich, Appellee, v. Frances Wallrich, Appellant.
No. 46058.

November 17, 1942.

Diamond & Jory, of Sheldon, for appellant.

L. L. Corcoran, of Sibley, and Fisher & Fisher, of Rock Rapids, for appellee.

MITCHELL, J.—The plaintiff was married on the 24th day of October 1939, to Harold Wallrich, who is the son of the defendant, Mrs. Frances Wallrich. The defendant is a widow and the mother of two sons and four daughters. The plaintiff is the daughter of a farmer living in the vicinity of Ashton, Iowa, and not far from the Wallrich farm. On the 27th day of December 1940, she commenced this action alleging that due to the conduct of the said defendant the affections of the plaintiff's husband were alienated and he was caused to leave and desert her. There was a trial to the jury, which returned a verdict for the plaintiff, and the defendant has appealed.

 The appellant strenuously argues that the lower court erred in overruling the motion for a directed verdict made by the appellant at the close of the appellee's testimony and renewed at the close of all of the evidence, contending that the record clearly shows that the evidence of the appellee and that of her witnesses was wholly insufficient to submit this case to the jury, and that as a matter of law it was the duty of the trial court to direct a verdict in favor of the appellant, so we turn to the record to ascertain the facts.

In the case of Stilwell v. Stilwell, 186 Iowa 177, 188, 172 N. W. 177, 182, this court said:

"In the case at bar, all we may inquire into is whether we can say, as matter of law, that the proof adduced was insufficient. The jury has found that the essentials to a verdict have been sufficiently established. We can interfere only if we may say that no reasonable mind could so find. It is not a question of what we think of the evidence. The narrow question before us is whether a jury could, in reason, find that the matters we have referred to as being necessary elements in the proof have been established. We have already said that, as a guide to appellate review, fact cases are of little help. In the last analysis, the question here is whether, as matter of law, the evidence in this very case is insufficient to sustain a recovery."

Verna Wallrich was born in Osceola county. She was the daughter of Mr. and Mrs. Joseph Klunenburg. She lived with her father and mother and two sisters on a farm not far from

the Wallrich farm. Harold Wallrich is the son of Mrs. Frances Wallrich, the appellant. He and his brother Gilbert rented a farm from their mother, and the mother, Mrs. Frances Wallrich, lived in the town of Ashton. Harold and Verna had been acquainted all of their lives. Verna, at the time of her marriage, was 21 and Harold was 28. While they were acquainted with each other and their families were acquainted they had never gone together until the evening of September 7, 1939. On that evening Vic Winchell, a friend of both of them, arranged an engagement between Harold and Verna. Harold drove to the home of Verna's parents, Vic accompanying him, and they picked up Verna, started to a near-by town to secure a young lady friend of Vic's and then headed to Remsen for the dance, stopping on the way at Sheldon, where liquor was purchased which was consumed later by the four of them at the dance. It was early on the morning of September 8th that they started back home, and sometime before they reached home Harold and Verna had intercourse. They were together on several occasions shortly thereafter and on several of these occasions they had intercourse.

On October 1st Verna informed Harold that she was pregnant and they made plans and arrangements to get married. They went to see their pastor and talked the matter over with him, and after leaving the pastor's home they went to the house where the appellant, Harold's mother, resided, a short distance away in the town of Ashton. Harold told his mother that he was going to get married and that Verna was to be her future daughter-in-law. The evidence shows that she said at that time she thought he was crazy, that she had never expected him to get married, and finally she asked him if he had to get married, what the matter was, and Harold said, "Yes." Then she asked the appellee if she was sure that it was necessary to get married and the appellee replied that it was. They informed the appellant that they had made arrangements with the pastor. Harold and Verna kept company every night thereafter until the day of the marriage. On the 9th day of October 1939, Harold came to the home of the Klunenburgs, accompanied by his mother, the appellant. There were present

at that meeting the appellant, the appellee, Harold Wallrich, and the parents of the appellee, Mr. and Mrs. Joseph Klunenburg. The appellant said she had heard that Verna was two and one-half months along before she ever went with Harold. Verna denied this and Verna's father said that Harold did not have to marry Verna unless he wanted to. Harold then spoke up that he believed what Verna was saying and that they would get married. There is in the record evidence of statements made by Harold to Verna prior to the time of the wedding in which Harold said that his mother had told him that Verna was not telling the truth about her condition and that his mother was trying to keep him from getting married; that she tried to keep him from getting the marriage license and was insisting that Verna was two and one-half months along already.

On the 24th day of October 1939, Harold Wallrich and Verna Klunenburg were married. A week later Harold and Verna went to the home of Mrs. Wallrich, the appellant, and offered to give her her choice of the wedding pictures. She complained about them, that she did not like them, and that they were not any good. About a week after ''the shower'' which was held for the young married couple, Mrs. Wallrich came out to the farm. She at that time made certain statements in which she said they were living like dogs. She called Verna a hound. There was some talk about a trip to St. Paul but she said they had better not take the trip, they had better save their money for ''that brat'' that ''will be on your hands in a couple of months.'' Verna asked what she meant by a couple of months and she said, ''Yes, in a couple of months.'' Appellant then said it was not ''Harold's kid'' that Verna was carrying. She said that if the child did not come on the day it was appointed for, 15th of June, that it was not any relation of hers and was not going to live on her place. Appellant then said that Harold had just married an old streetwalker and that Verna had run around with every Tom, Dick and Harry, and she said she ''knew whose kid that was,'' and she mentioned a man's name.

The record clearly shows that Harold and Verna had no trouble from the time they were married up until the day, to

wit, May 19, 1940, when he took Verna to the hospital at Sibley and the baby was born. During this period of time, there is evidence in the record of a continuous hostile attitude of the mother toward the appellee, Verna. This evidence, of course, is denied by the mother, but that makes it a fact question for the jury to decide.

Appellant argued that as mother of this boy she had the right to counsel him in all matters relating to his welfare. This, of course, is true but there is the added condition that in so doing she must act in good faith. In the case of Heisler v. Heisler, 151 Iowa 503, 505, 131 N. W. 676, 677, this court said:

"Appellants say that even if the jury might have found that his affections had been alienated, the finding that this had been caused by wrongdoing on their part is not sustained by the evidence. In passing on this question, it must be borne in mind that the defendants are the parents of Willie, and, owing to this relation, had the right to counsel him in all the matters relating to his welfare, provided that in so doing they acted in good faith. The reciprocal obligations and the affection of parent and child continue through life, after as well as before marriage, and caution must be exercised lest the assertion of a supposed right of action be made to rest upon a proper parental regard to the welfare and happiness of the child. There is a broad distinction between a case of this kind against the parent and one against a stranger. Parents are under obligations by the laws of nature to protect their children from injury and relieve them when in distress. Their natural affections prompt them to interest themselves in the welfare of the child. Conduct of a stranger which justly would be characterized as that of a malicious intermeddler might express but the natural impulse of parents. The law recognizes the right of father or mother to advise their son concerning his domestic affairs, even though this lead to separation or that separation be effected, without incurring liability for alienation, if the advice be given honestly with a view to the welfare of both parties. Beisel v. Gerlach, 221 Pa. 232 (60 Atl. 721, 18 L. R. A. (N. S.) 516); Leavell v. Leavell, 122 Mo. App. 654 (99 S. W. 460); Tucker v. Tucker, 74 Miss. 93 (19 South. 955, 32 L. R. A.

623) ; Tasker v. Stanley, 153 Mass. 148 (26 N. E. 417, 10 L. R. A. 468) ; Oakman v. Belden, 94 Me. 280 (47 Atl. 553, 80 Am. St. Rep. 396) ; Barton v. Barton, 119 Mo. App. 507 (94 S. W. 574) ; Hutcheson v. Peck, 5 Johns. (N. Y.) 196.''

This court, in the case of Moir v. Moir, 181 Iowa 1005, 1008, 165 N. W. 221, 222, again emphasizes this matter when it says:

''The circumstance that a child is married does not sever the parents' relations with him. He may lawfully and is likely always to talk over his affairs, and especially his troubles, even those relating to his domestic affairs, with them, and the law recognizes the right of parents to counsel their children, even after marriage, and concerning the most delicate relations of life. Heisler v. Heisler, 151 Iowa 503, 505; Miller v. Miller, 154 Iowa 344; Busenbark v. Busenbark, 150 Iowa 7; Pooley v. Dutton, 165 Iowa 745. For this reason, more proof is required to sustain such an action against a parent than against a stranger. Even though a father's advice be unsound or foolish, if it be given in good faith, he is exonerated. Moreover, good faith is to be presumed, and malice must in all cases be proven directly, or the circumstances shown to be such that malice may be inferred. Heisler v. Heisler, supra; Geromini v. Brunelle, 214 Mass. 492 (46 L. R. A. [N. S.] 465, and all cases collected in note).''

We have no fault to find with this rule but it does not give to the parents an unlimited right to destroy the affection that a child has for his wife. They must act in good faith. They must have some basis for the rumors and the charges they make. The appellant had no right, as the mother of Harold, to accuse Verna of unchastity, of being a streetwalker, and of running around with other men. There is no basis in this record upon which any such charges could be made, for the record shows that Verna Wallrich had never had intercourse before the evening of September 7th, when she went out with Harold Wallrich. While, as most young girls, she had gone around with other men, there is no evidence that she kept steady company with any individual, nor of any improper relationship between her and any other man. Great reliance is placed by

the appellant upon the case of Heisler v. Heisler, 151 Iowa 503, 510, 131 N. W. 676, 678, and yet in that very case this court held that it was a question for the jury in regard to the mother. We quote from that opinion:

"Probably faultfinding with plaintiff's cooking, with the arrangement of her furniture, with entertaining members of her family, with raising too many chickens, with her counsel to Willie in the operation of the farm, and even with working him to death, and the like, would not be enough to justify such a finding, but when all these were supplemented by repeated insinuations and accusations against plaintiff's character for chastity, and these were shown to have influenced Willie against his wife, and were persisted in after she must have known their effect, a case was made for the jury. It should be added that the evidence concerning the different complaints of this defendant's conduct is in sharp conflict, and we have undertaken to do no more than indicate the tendency of that introduced in behalf of plaintiff."

Certainly the record in the case at bar is stronger than in the case of Heisler v. Heisler, supra. This record shows that within a few days after the baby was born this appellant went to the doctor who delivered the child to check up on whether the child was full term or not. The appellant testified that Dr. Reinsch on that occasion told her there might be a variation of three weeks in the time that a child came, and yet we find that she went from her home in Ashton, either on the same day that she consulted with the doctor or a day or so later, out to the farm, where she talked with her son Harold. According to appellant's own testimony, when she reached the farm she found Harold out dragging the field. When Harold came in, we quote from her testimony:

"Gilbert says you said you had your baby but you said it wasn't yours. That's a great note. If that is the case you and your wife better get a house in town and better live there. It would be better for all of us if you did that."

She said she then started to cry and lay down on the davenport. Knowing as she did from the doctor's own state-

ment to her there could have been a difference of three weeks in the time of the birth of the child, yet immediately she said to her son Harold that they had better leave the farm. It must be kept in mind that this was a day or so after the child was born and it was on either the next day or the following day that Harold told Verna, when Verna was still in the hospital, that his mother was complaining bitterly, and shortly thereafter Harold abandoned Verna and the baby.

In addition to this testimony there is direct evidence that after the baby was born appellant told a witness that it was too bad about Harold and Verna, that the baby came too soon and, "it wasn't Harold's baby and that she was going to have the marriage annulled."

True, this testimony is denied by the appellant, but the question that we are now dealing with is whether or not there is sufficient evidence to take this case to the jury, in view of the evidence that there was no trouble between these young people except on the occasions when the mother would come to the house and make charges such as she did, and in view of the evidence that within a few days following the birth of this child the appellant went to the doctor that had taken care of Verna Wallrich to ascertain the facts, and shortly thereafter went out to the farm, where she talked with her son Harold about the fact that the child was not his child. True, she says that was the statement made by Harold himself, but the jury would have a right to draw certain inferences from the facts that she consulted the doctor and then traveled out to the son's farm and started discussing this very question, and that it was immediately after this conversation between the mother and the son that Harold told his wife he could not live with her any longer.

We can come to no other conclusion than the question was one for the jury and that the lower court was right in overruling the motion to direct.

It is next argued that the lower court erred when stating the issues to the jury by reading practically verbatim appellee's petition and thus submitting to the jury issues upon which there was not competent evidence to support the same. This court has on numerous occasions condemned the custom

of copying verbatim the pleadings in the court's instructions. The copying of the pleadings, however, though not approved, is not necessarily error. See Graham v. Ochsner, 193 Iowa 1196, 188 N. W. 838; Reed v. Pape, 226 Iowa 170, 284 N. W. 106; Elmore v. Des Moines City R. Co., 207 Iowa 862, 224 N. W. 28; and Hoegh v. See, 215 Iowa 733, 246 N. W. 787.

In the case at bar the only reference in the instructions to appellee's claim to which appellant objects is that appellant threatened to disinherit her son if he did not abandon his wife. This is in the first instruction, which is a mere recital of the allegations of the pleadings. While it is true there is no direct competent evidence that such threat was made by appellant, some of the statements shown to have been made by her are somewhat similar and from them the inference might have been drawn that she intended to disinherit her son. There is competent evidence in the record that this appellant stated, prior to the birth of the baby to the appellee, that the child would not inherit any of her property. While we believe it would have been better if the statement had been omitted from the court's recital of the claims of the parties, its inclusion is not sufficient basis for a reversal. In the case of Evans v. City of Council Bluffs, 187 Iowa 369, 375, 174 N. W. 238, 240, this court said:

"While we do not approve the setting out of all the claims of the plaintiff, whether they be supported by the evidence or not, and while we think it better practice to set out only those matters which the jury are entitled to consider, yet, as the court, in other instructions, limited the jury to the consideration of such matters only as the plaintiff had offered evidence tending to support, we cannot reverse on account of this method of instructing the jury."

In the case of Elmore v. Des Moines City R. Co., 207 Iowa 862, 867, 224 N. W. 28, 30, this court, speaking through Justice Wagner, said:

"The court in Instruction No. 1 gives a statement of the grounds of negligence claimed by the plaintiff. The appellant further complains that, in this manner, all of said grounds of negligence were submitted to the jury, and that there was no

evidence tending to establish some of the same. There is no merit in this contention of the appellant's. Instruction No. 1 was only a preliminary statement. In a subsequent instruction, the court specifically told the jury upon what grounds of negligence a recovery could be had, and no exception to said instruction was taken by the appellant.''

See, also, Groshens v. Lund, 222 Iowa 49, 268 N. W. 496.

In the case at bar the instruction complained of is the preliminary statement of the issues by the court. Later in the instructions the trial court properly told the jury what plaintiff was required to prove in order to recover. The law governing the case was correctly stated and the jury was told to base its verdict on the evidence. Both sides were represented by able counsel. The case was well tried. The issue in this case was not complicated. It was a question for the jury. It has returned its verdict, and, there being no error, it necessarily follows that this case must be, and it is,—Affirmed.

SAGER, GARFIELD, STIGER, BLISS, OLIVER, and MILLER, JJ., concur.