PHYLISS KOEHLER, appellee, v. ED KOEHLER et ux., appellants.

No. 49021.

(Reported in 79 N.W.2d 791)

DECEMBER 11, 1956.

Murphy & Murphy, of Sumner, and R. Eldon Laird, of Waverly, for appellants.

O'Brien & O'Brien, of Oelwein, and Sweet, Sager & Engelbrecht, of Waverly, for appellee.

GARFIELD, J.—This is a law action against the parents of plaintiff's husband for damages for alienating his affections. From a verdict and judgment for plaintiff for $8500 defendants have appealed. The only question we find it necessary to consider is the sufficiency of the evidence to support recovery.

In this connection plaintiff is entitled to have taken as true the evidence adduced by her and to have the benefit of the strongest inferences reasonably to be drawn therefrom. Stilwell v. Stilwell, 186 Iowa 177, 189, 172 N.W. 177. Perhaps this is merely one way of saying it is our duty to view the testimony in the light most favorable to plaintiff. See Glatstein v. Grund, 243 Iowa 541, 545, 51 N.W.2d 162, 166, 36 A. L. R.2d 531.

Phyliss Rogers, a schoolteacher then 22, married Stanley Koehler, a plumber's helper then 25, September 7, 1952, after a

courtship of a year and an engagement of five months. Three days after the wedding she was taken to a hospital in Waterloo and placed in the care of a psychiatrist. After five weeks there she was removed to a sanitarium in Dubuque for four months. During this period plaintiff was upset emotionally and mentally. From the time Phyliss was taken to Waterloo she and Stanley never lived together.

During the April and May before their marriage plaintiff and Stanley engaged in four acts of intercourse. They never had intercourse thereafter. Plaintiff thought she was pregnant in May, told Stanley of it and they agreed they would not tell their parents about it. Plaintiff's baby was born the following February 3 (1953) while plaintiff was still a patient in Dubuque.

Stanley's parents, defendants herein, approved the engagement and seemed very happy about it. They owned a house in Sumner in which it was planned the newlyweds should live at least a few months. (Defendants lived on a farm.) The plan never materialized.

The first act of either defendant of which plaintiff complains occurred at the wedding rehearsal forty-eight hours before the church wedding. Stanley's father said to plaintiff and Stanley, "Don't make a damned fool of yourselves coming down the aisle." Following this remark plaintiff was not happy. "I felt awful, wondering if I was going to do the right thing." Preceding the remark those at the rehearsal were laughing, joking and "cutting up", but plaintiff insists the statement was not made in a joking manner.

Twenty-four hours after the wedding defendants gave a dance for the wedding party and many others. Plaintiff dressed in defendants' home for the dance. The question apparently arose whether she should wear her veil. Stanley's mother said, "If you are pregnant you don't wear that veil. If you wear it that says you are not pregnant." Plaintiff replied, "Stanley and I came to each other in white. My veil goes on." And plaintiff proceeded to wear her veil to the dance. This talk did not occur in Stanley's presence.

This statement of Stanley's mother made plaintiff very nervous and weak. She may have assumed from it that Stanley, in violation of his agreement, told his mother plaintiff was pregnant.

In any event plaintiff felt Mrs. Koehler knew of the pregnancy. Stanley claims he did not know plaintiff was pregnant until he learned it from a doctor one to two weeks after she was taken to the Waterloo hospital. Plaintiff was much upset at the dance and danced but little. Defendants admit Mrs. Koehler made a remark like that testified to by plaintiff and her mother but defendants say it was made about a month before the wedding and in a joking manner.

After the dance the newlyweds started in Stanley's car for a tourist cabin at Oelwein to spend the night. On the way there a "stink bomb" exploded in the automobile. This caused some damage to the car which they had repaired. After starting for Oelwein again a second such bomb exploded in Stanley's car. These two explosions further upset plaintiff. There is no evidence defendants had anything to do with placing these bombs in the automobile. Some prankster evidently did it.

Plaintiff remembers nothing from the time she went to sleep in the Oelwein cabin late that night until nearly two months later when she was in the Dubuque sanitarium. Early the morning after the dance plaintiff had the proprietor of the cabins telephone her mother and uncle to come there. Plaintiff had made her home with them—she never knew her father. When the mother and uncle arrived at Oelwein they found plaintiff very nervous and upset. They all, including Stanley, then went to the uncle's farm home.

When plaintiff failed to "snap out of it" the family doctor examined her, found her about four and one-half months pregnant, suffering from "an anxiety neurosis due to an embarrassment." The doctor testifies, "It is my belief this stress and strain was caused by pregnancy before marriage." He recommended plaintiff be taken to the Waterloo hospital and placed in the care of a psychiatrist. Defendants' family doctor also saw plaintiff and joined in this recommendation. It was decided to take plaintiff to this hospital the third night after the wedding.

Plaintiff's mother and uncle and Stanley's father and younger brother accompanied plaintiff to Waterloo. Stanley did not go. His father said he was "in no shape to go." Stanley had had polio in 1946 and suffered a rather serious temporary injury

about three weeks before the wedding. Stanley visited the Waterloo hospital several times during the five weeks his wife was there. Some of the times he was not permitted to see her because of her condition. Defendants made four trips to Waterloo to see plaintiff, but were not allowed to see her on any occasion.

Plaintiff's mother and uncle felt plaintiff was not making progress at Waterloo and it was decided to take her to the Dubuque sanitarium. Stanley and his younger brother accompanied plaintiff's mother and uncle when they took plaintiff to Dubuque where, as stated, she was confined four months. Stanley never visited his wife in Dubuque. When plaintiff was about to be discharged from the sanitarium Stanley said he had no place for her. When asked what he wanted done with the baby he told plaintiff's mother to arrange for its care.

Plaintiff's mother paid the bills to the Waterloo hospital and Dubuque sanitarium although plaintiff's insurance paid $218 of the total amount. The doctor bills are unpaid. Stanley, through his attorney, paid the "baby fold" in Dubuque for care of the baby during the time it was there. Stanley refused to pay or obligate himself for plaintiff's care at both Waterloo and Dubuque. He wanted plaintiff taken to the state mental institution at Independence where he thought much of the cost of her care would be borne by the county and state.

There is substantial evidence that defendants strongly advised Stanley not to obligate himself for his wife's care in both Waterloo and Dubuque. Defendants did not want Stanley to accompany plaintiff to Dubuque when she was taken there for fear he might obligate himself for her care in the sanitarium. Defendants saw to it that Stanley's younger brother went with him to Dubuque, at least, in part, to deter him from "signing papers" there. When it came time to sign an obligation to pay the sanitarium the brother admonished Stanley not to do so and plaintiff's mother signed the paper.

There is no evidence Stanley had money or property aside from his current earnings and his automobile. Stanley testifies he had no money. There is a wide spread between the wages he was paid as a plumber's helper and the prices plumbers customarily charge for their services. During plaintiff's illness Stanley's gross pay was $40.70 per week.

Plaintiff puts much reliance on a letter Stanley's mother wrote plaintiff's mother soon after Phyliss was taken to Dubuque. The letter says:

"The poor girl (Phyliss) I sure give her my heart, and to Stanley to.

"Millie we have talked to several Dr's and they inform us the child will never be O.K. and Phyliss will be this way for another three months if she is six along, they said why not talk it over with you & Stanley about taking the child, they said they could now or you could wait until seven months. * * * They felt as though Phyliss was to embarrassed for this to happen and that is the cause of her mind to be. For I know she was that way before the dance.

"I think if this would be a help for her the sooner it is done the better it would be. They also informed us that if they take the child in 3 or 4 days she should have it fixed she wouldn't get that way again. (What do you think) They can rather adopt them one as to have this hardship. * * *

"We sure don't know what to do about the house, sure hate to fire the furnace and nobody there, don't like to see Stanley stay there alone either.

"Sunday he said he was going hunting and he didn't come home so Ed drove out in the field there he was up along the north willows laying and crying so I think Millie the sooner something would be done the better it would be for I am worried about Stanley.

"* * * So please Millie you see what you can do its all of our wish Phyliss gets well and I know we all pray for her.

"Let me know when you hear any more else drive up. Can talk to you better.

Esther

"P.S. They said should put the child in a home, for she would be embarrassed to bring it home. I hope something can be done for poor Stanley. Am afraid he will do something to himself."

There is no evidence this letter ever came to Stanley's attention or that either defendant expressed to him the views stated

therein. It will be noticed the letter mainly passes on to plaintiff's mother information it is claimed defendants received from doctors.

About November 1, 1952, Stanley consulted an attorney regarding an annulment of his marriage on the claim plaintiff was insane at the time of the marriage. (It is a ground for annulment that either spouse was insane at the time of the marriage. Section 598.19, Codes, 1950, 1954.) Defendants insist the attorney was seen without their knowledge and they cautioned Stanley to go slow in starting any annulment action. The attorney seems to have discouraged any such move. Plaintiff started suit for divorce about June 1, 1953. The suit was still pending when the present action was tried.

Stanley admits he and plaintiff thought a great deal of each other when they were married but says he lost all affection for her by the following spring and had none at the time of trial. He maintains his loss of affection is due to his belief he is not the father of plaintiff's child. No testimony other than Stanley's furnishes any support for such belief. Following the marriage Stanley continued to make his home with defendants on their farm near Sumner.

Although some details have been omitted, the above is a fair indication of the record. We think it insufficient to support recovery. Certainly the remark attributed to Stanley's father at the wedding rehearsal, though abrupt and perhaps ill advised, must be regarded as trivial. It was addressed to both bride and groom and could scarcely have been made from an improper motive. The statement Stanley's mother made when plaintiff was dressing for the post-wedding dance doubtless helped to upset her and should not have been made under the circumstances. But there is no evidence Stanley heard it or that it could have had any tendency to alienate his affection for plaintiff.

Little need be said regarding the letter in addition to what has already been stated. Any finding that it or the views therein expressed came to Stanley's attention would rest on surmise. It may be conceded for present purposes the advice the letter says was received from doctors was unwise and plaintiff's mother rightly rejected it.

Nearest approach to a case for plaintiff lies in the evidence defendants urged Stanley not to obligate himself for his wife's care in the private institutions in Waterloo and Dubuque but that she be sent to the state institution at Independence. The wisdom of this advice may be open to serious question. But we think defendants had a right under the circumstances to give it to their son without becoming liable in this action.

Of course, as the trial court instructed the jury, defendants were under no legal obligation to pay for plaintiff's care themselves. Moir v. Moir, 181 Iowa 1005, 1008, 1010, 165 N.W. 221; Worth v. Worth, 48 Wyo. 441, 49 P.2d 649, 103 A. L. R. 107, 122, 123; annotation 108 A. L. R. 408, 416.

The three essential elements of such a cause of action as this are: (1) wrongful conduct of defendants (2) loss of affection of the spouse, and (3) causal connection between such conduct and loss. Rank v. Kuhn, 236 Iowa 854, 857, 20 N.W.2d 72, 74, and citations; Wallace v. Wallace, 85 Mont. 492, 279 P. 374, 66 A. L. R. 587, 596. As we have indicated it is admitted Stanley lost his affection for Phyliss. But we find no substantial evidence such loss was caused by conduct of defendants which was wrongful within the meaning of the law.

More proof is required to support an action of this kind against the spouse's parents than against a stranger. This is because of the parents' right to advise a married child in all matters relating to his welfare, including his domestic affairs, provided the advice is given in good faith and not from malice or other improper motive. Glatstein v. Grund, supra, 243 Iowa 541, 545, 546, 51 N.W.2d 162, 166, 36 A. L. R.2d 531, 538, and citations; Moir v. Moir, supra, 181 Iowa 1005, 1009, 165 N.W. 221; annotation 108 A. L. R. 408, 410; 27 Am. Jur., Husband and Wife, sections 529–531.

Even though the advice a parent gives a married child is indiscreet or unfortunate the former is not liable in such an action as this if it be given in good faith. Moreover good faith of the parent is presumed and malice or other improper motive must be proven. The burden to overcome the presumption of good faith rests upon plaintiff. Moir v. Moir, supra, 181 Iowa 1005, 1009, 165 N.W. 221, and citations; Pooley v. Dutton, 165 Iowa 745, 754, 756, 147 N.W. 154; Miller v. Miller, 154 Iowa 344, 350, 351,

134 N.W. 1058; Busenbark v. Busenbark, 150 Iowa 7, 14, 129 N.W. 332; annotation 108 A. L. R. 408, 413, 414; 42 C. J. S., Husband and Wife, section 687.

It is true, as the jury was instructed, the malice which must be proven in an action of this kind is not confined to what is frequently called actual malice—spite, hatred or ill will. So-called legal malice is sufficient—the intentional doing of a wrongful act without just cause or excuse. Annotation 108 A. L. R 408, 421, 422; 42 C. J. S., Husband and Wife, section 662; 27 Am. Jur., Husband and Wife, section 527. See also Rank v. Kuhn, supra, 236 Iowa 854, 857, 20 N.W.2d 72, 74, and citations.

As we have indicated we think the evidence is insufficient to warrant a finding defendants did not act in good faith in the conduct of which complaint is made. The conclusion is just as reasonable they were honestly attempting to further the welfare of their son.

We have considered the precedents upon which plaintiff relies. The evidence for plaintiff here does not compare with that in Glatstein v. Grund, 243 Iowa 541, 51 N.W.2d 162, 36 A.L.R.2d 531, or Rank v. Kuhn, both supra, 236 Iowa 854, 20 N.W.2d 72. Further, defendant in the Rank case was not the spouse's parent but his aunt against whom wrongful conduct was clearly shown. We feel the evidence for plaintiff is weaker than it is in Wallrich v. Wallrich, 232 Iowa 762, 6 N.W.2d 107; Stilwell v. Stilwell, supra, 186 Iowa 177, 172 N.W. 177, and Price v. Price, 91 Iowa 693, 60 N.W. 202, 29 L. R. A. 150, 51 Am. St. Rep. 360.

We conclude the trial court should have directed a verdict for defendants at the end of all the evidence. While the case is reversed and remanded for another trial (see rule 349, Rules of Civil Procedure) defendants will be entitled to a directed verdict thereon unless the evidence for plaintiff is materially stronger than that upon the first trial.—Reversed and remanded.

All JUSTICES concur.